THEODORE REICHERT v. MINNESOTA NORTHERN
NATURAL GAS COMPANY AND ANOTHER.
JOHN J. REICHERT v. SAME.
FREDELL CONSTRUCTION COMPANY, APPELLANT.[1]

November 15, 1935.

Nos. 30,388, 30,389.

[1]Reported in 263 N. W. 297.

388

*Gillette & Meagher, H. L. & J. W. Schmitt,* and *Charlotte Farrish,* for appellant.

*Thomas H. Quinn,* for respondent.

LORING, JUSTICE.

In actions by John J. Reichert, as father of Theodore Reichert, a minor, for personal injuries suffered by his son, and by himself for medical expenses incurred on account of these injuries, verdicts were rendered against both defendants. Upon motion, judgments notwithstanding the verdicts were ordered in both cases in favor

of the Minnesota Northern Natural Gas Company (hereinafter called the gas company). A like motion on the part of the Fredell Construction Company (hereinafter called the construction company) was denied and judgments entered against it, and it is from those judgments that these appeals are taken.

The gas company, pursuant to a plan to bring natural gas from the south, was constructing a pipe line through Rice county in this state. The construction company, under a contract with the gas company, was to build this part of the line. Easements across the farms in that county were obtained, one of which ran through the farm of the plaintiff, John J. Reichert. After the pipe had been strung along the right of way a paint crew painted the pipe. The paint, necessary to prevent rust and deterioration of the pipe, was different in different localities, depending upon the character of the country in which the line was laid. Two types of paint were being used—a "hot" paint which was solid until heated, and a "cold" paint (free running) called biturine No. 4. Up to Faribault and for some miles north of it cold paint was chiefly used. This was true at the Reichert farm, where the right of way ran through high ground. Both paints were furnished by the gas company but were picked up at the receiving point by a wagon of the construction company and hauled to the pipe line right of way and applied by construction company men. The biturine No. 4 came in 53-gallon steel drums. When these drums reached the right of way they were tapped by unscrewing a plug located on the top of the drum and by inserting a faucet in the vent. The drum was then tipped on its side, and another plug was unscrewed and loosened to let in air. The paint was run out of the faucet into pails and carried to the pipe line for application. The faucet was taken out and the drum tipped up in order to get out the last of the paint. Necessarily a small amount would adhere to the inside of the drum. The empty drums were then thrown off along the right of way, the vents on the side and top first being closed. The job of collecting the supply drums and removing them from the right of way was let to a man named Galbreath. With the consent or acquiescence of the construction company, the farmers in the vicinity were in

the habit of getting these drums and converting them into barrels by cutting out the heads.

Theodore's brother observed one of these drums lying in a creek bottom on the Reichert farm, adjacent to the gas company's right of way but some distance away from it. The jury might reasonably infer that it had rolled down the hill from the right of way to the creek. The brother told Theodore, who was then ten years of age, that he had seen the drum. Theodore, alone and unassisted, went to the creek, found the drum, and rolled it out of the dry creek bed and up to his father's granary, a distance of about a quarter of a mile. His purpose was to cut the head out of the drum and convert it into a swill barrel. It was a warm day, and the thermometer stood between 80 and 90 degrees Fahrenheit. The drum was black, and on account of the heat from the direct rays of the sun the temperature was even higher inside the drum. Theodore unscrewed the plug on the top of the drum and with a cold chisel and hammer endeavored to cut out the head. He placed the cold chisel against the top of the barrel and commenced pounding it with the hammer. Almost immediately an explosion occurred which drove out the head of the drum and severely injured the boy. No complaint is now made by the appellant that the verdicts were excessive.

Plaintiffs contend that the defendants knew that the paint when warmed was of an explosive character; that the construction company, knowing how the drums were occasionally converted by farmers, negligently left this one on Reichert's farm where it was likely, in the process of conversion, to cause injury to someone; and that the company's negligence was the proximate cause of plaintiff's and his son's injuries.

The construction company, on the other hand, asserts that the record does not show that it was responsible for the drum getting onto Reichert's land; that a man of ordinary prudence would not anticipate injury to anyone from allowing the drum to remain in the creek at the point to which it had rolled; that if this was negligence it was not the proximate cause of the injury to young Reichert; and, further, that Galbreath, its independent contractor,

was charged with the duty of removing the drum and that the construction company was not responsible for his failure to do so.

1. We think there is sufficient evidence in the record from which the jury might legitimately draw the inference that the construction company, which had charge of the empty barrels, allowed this drum to roll from the right of way to the point where it was found by young Reichert. The serious question in this case is whether it was negligence on the part of the construction company to leave the drum on Reichert's land. That question is necessarily determined by whether a person of ordinary prudence, knowing what the construction company knew or ought to have known about the contents of the drum, would anticipate injury to anyone from allowing it to remain there.

The construction company had had long experience in the use of this paint, and it claims that it had no knowledge whatever of any explosions having occurred. On the other hand, there was evidence in the record tending to show that there was sufficient naphtha or like ingredient in the paint so that at a temperature inside the drum of 90 degrees or more, gas, which was inflammable and, if confined, explosive, would be generated by mixture with the air in the drum. From the record we conclude that the construction company was aware or should have been aware of this quality in the paint. It was also aware that these drums were in demand amongst farmers and were likely to be converted by them for farm purposes by cutting out the heads. Obviously, the head could be cut out only by the use of some hard, sharp, metallic instrument like a cold chisel, which was likely to produce sparks in the operation. At the temperature within the drum above 90 degrees (which should be expected in warm days in summer and fall), those sparks would, if they came in contact with the gas while it was still confined in the drum, produce a dangerous explosion which persons accustomed only to the ordinary paint drum or barrel would not be likely to anticipate or expect to occur in the normal course of events. It will therefore be seen that the principal question is whether the construction company should have known of the explosive character of the gas generated by the application of heat

to the contents of the drum. There is evidence in the record that one of the paint drums exploded while the line was being constructed through one of the towns farther to the south. It is not clear what was the cause of the explosion. Fire may have been communicated to it, but the cause of that explosion is not so material. There is also some evidence in the record that employes were cautioned against the use of cigarettes in close proximity to the paint. Upon the whole record, we think it was a jury question whether the construction company knew or should have known of the explosive character of the ingredients, part of which necessarily adhered to these empty drums, and it was likewise a jury question whether a person of ordinary prudence in the situation in which the construction company found itself should reasonably have anticipated some injury to someone in the process of conversion of the drums, which process, it seems, was reasonably to be expected because the barrels were in considerable demand for that very purpose. The case is a borderline case, but on the whole record we think there was sufficient evidence of negligence to go to the jury.

2. We find no difficulty with the question of proximate cause. If the act was negligent, the injury to young Reichert followed in an unbroken natural sequence in the ordinary and natural course of events and without an intervening efficient cause. Leaving the drum in the condition described was a substantial factor in causing the injury. 4 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 7000, and cases cited; Sedita v. Steinberg, 105 Conn. 1, 134 A. 243, 49 A. L. R. 154, 157; Lawrence v. City of Scranton, 284 Pa. 215, 130 A. 428, 41 A. L. R. 454, 460.

3. Nor do we think that the defense of independent contractor can prevail. If it was negligence to allow the drum to remain where the construction company left it, the company did not discharge its duty by delegating its removal to an independent contractor. Carlton County F. M. F. Ins. Co. v. Foley Brothers, 117 Minn. 59, 134 N. W. 309, 38 L.R.A.(N.S.) 175.

Affirmed.

STONE, JUSTICE (dissenting).

In my judgment, there was no evidence of negligence. The case to me seems of the same sort as Fitzpatrick v. Rose Donahue Realty Co. 151 Minn. 128, 186 N. W. 141, 36 A. L. R. 20, where a child was injured by slacked lime. The negligence alleged was that of an apartment owner in permitting the barrel to be where it was. The holding that as matter of law there was no negligence was explained thus [151 Minn. 130]: "There was so little cause in common experience to apprehend a casualty that happened in this case that, in our opinion, defendant was not under duty to cause the removal of the material."

HOLT and I. M. OLSEN, JUSTICES (dissenting).
We join in the above dissent.