A. A. WINGROVE, *Admr.*, *v.* HOME LAND COMPANY *et al.*

(No. 8697)

Submitted March 23, 1938.   Decided April 9, 1938.

*W. W. Goldsmith* and *Wm. G. Thompson,* for plaintiff in error.

*Love & Love,* for defendants in error.

Fox, Judge:

A. A. Wingrove, administrator of the estate of J. E. Wingrove, deceased, instituted this suit in the Circuit Court of Fayette County against the Home Land Company and H. H. O'Neal to recover damages for their alleged negligence which, it is claimed, resulted in the death of his decedent. There was no appearance on the part of O'Neal. The Home Land Company filed its demurrer to the original declaration which was sustained. An amended declaration was then filed, a demurrer thereto overruled, and a plea of not guilty filed. The case was tried by a jury, and at the completion of the testimony, upon motion of the defendant, a verdict was directed and returned in its favor, and judgment entered thereon. To this judgment the plaintiff prosecutes this writ of error.

The facts necessary to be considered in arriving at a decision on the points raised are as follows:

The Home Land Company is the owner of certain real estate in the town of Fayetteville on which it erected a gasoline filling station, and leased the same to H. H. O'Neal by written agreement dated November 15, 1934. Under the terms of the lease, the lessee agreed to pay to the lessor monthly one and one-half cents per gallon for

all gasoline sold, with provision for a minimum monthly rental of $65.00. It was stipulated therein that upon the expiration of the lease the " * * * Lessee is to return the property and equipment herein described to Lessor and Lessee shall restore said premises to the condition existing on the date when Lessee takes possession of the premises, ordinary wear and tear only excepted, provided, however, Lessee shall not be required to replace and relocate any buildings, tanks, structures or machinery removed or relocated with the express consent of Lessor." Later, the premises were sublet to C. M. Jarrell, who was operating the station at the time of the injury complained of, but Jarrell is not a party to this action. About February, 1936, the pipe connections of two of the tanks located in the filling station became broken, supposedly on account of freezing, and the tanks being entirely covered by a concrete pavement, it was necessary to break the concrete at two points in order to restore the connections. The necessity for the repairs was made known to the Home Land Company, the landlord, and it undertook the work of making the necessary repairs. The concrete was broken, considerable earth removed, the necessary repairs made and the earth, or part of it, returned to the excavation and limestone chips used which raised the level at that point above the surrounding concrete. The ground later settled some two or three inches below the level of the pavement. The testimony is that notice of this settling was given to the Home Land Company and that, through its agent, it, in effect, promised to correct the situation, but did not do so. The strips of concrete removed were parallel, about eight feet long and approximately twenty inches wide. Under these conditions, on Saturday, the 2nd day of May, 1936, about 8 o'clock in the evening, Alf Davis drove his automobile into the filling station and drove the front wheels thereof over one of the depressions mentioned and onto a strip of pavement some two feet wide between the two depressions. He was accompanied by J. E. Wingrove, plaintiff's decedent, who apparently

was his guest. Davis purchased a quart of oil, and at some time, whether before or after the purchase had been consummated, Wingrove, according to his statement to Davis immediately after the accident, decided to visit one of the toilets in the filling station, opened the car door, and, it is contended, backed out of the car onto the concrete. The evidence indicates that he had succeeded in getting out of the car onto the concrete, and then took a step into one of the depressions in the pavement, causing him to turn his ankle, lose his balance and fall forward toward the front of the car. In some way, not exactly known, but presumably by coming in contact with the license plate on the front of the car, his right wrist was cut, causing a deep wound. Immediately after the accident, Wingrove went to a water spigot on the station premises and washed the wound. Friction tape, commonly used for wrapping electric wires, was used to wrap the wound, and he then left the station, and was taken to his boarding house. Davis suggested to Wingrove that he visit a doctor, who was located some three hundred feet from the boarding house, but he did not do so, saying he thought he would be all right. About two o'clock the next morning, Wingrove was seen at a lunch room in Oak Hill. At that time, he had blood on his face, there was mud on his clothes, and the proprietor of the lunch room cleaned him up, washed the blood off his arm and wiped it with a paper towel. About three o'clock on the same morning, Wingrove was seen at Craigo's place on the outskirts of Fayetteville. At that time, the black friction tape which had been wrapped around the wound at the filling station had, according to the testimony of one witness, worked down into the cut on his wrist, and someone applied a salve to the wound, and a gauze bandage fastened with adhesive tape. He remained at Craigo's place until about five o'clock in the morning, but later, about 9 or 10 o'clock, he returned there and then went to a place called Shady Rest, located between Fayetteville and Oak Hill, where he went to bed and slept during the afternoon and until late at

night, when he returned to his boarding house in Fayetteville. He first saw a doctor about eleven o'clock on the night of Sunday, May 3rd, at least twenty-six hours after the accident at the filling station, and by that time the wound on his arm had become infected and was showing signs of blood poisoning. Approved methods of treatment were then applied, and on the day following, Wingrove went to the hospital and had the wound dressed. He returned to the hospital on May 6th, and remained there until his death on May 12th. It is apparently conceded that his death resulted from blood poisoning.

Three outstanding questions are presented: (1) The liability of the lessor, in any event, under the terms of its lease to O'Neal, and its voluntary act in assuming to repair the premises; (2) whether the deceased was an invitee to whom the defendants owed the duty of keeping the filling station in a reasonable state of repair, or a mere licensee, to whom they owed no duty other than to avoid wanton or wilful injury; and (3) whether there was such connection between the injury sustained by the decedent and his death as would have justified the jury in finding that his death resulted from the injury complained of.

It is contended by the Home Land Company that it is in no event liable to the plaintiff, because liability, if any, rests on its lessee under the terms of its lease; that it had no responsibility for the repairs made, and is not liable for any negligence in connection therewith, even though its voluntary action with respect to such repairs be admitted. It may be true that under the terms of the lease, the lessor was not bound to make repairs, and that if the lessee had allowed the premises to reach a condition such as to make them dangerous, it was his responsibility, not that of the lessor. However, the record shows (1) that the lessor was interested in having the two tanks repaired, because the income from the station depended upon the sales of gasoline, and it is apparent, of course, that where tanks are used to store different kinds and grades of gasoline, as they were in this case, if

two of the three tanks were out of use, the sales of gasoline would necessarily be reduced, because sales would be limited to a single grade; and (2) it is also shown that under these circumstances, the Home Land Company voluntarily, and in its own interest, undertook to make the repairs. Even if the duty rested upon the lessee to make the repairs, that did not prevent the lessor from so doing; and when he elected to make them, he assumed an obligation to complete the work and restore the premises to their approximate condition at the time the repairs began. The contention that at some point in the repairs, the obligation and duty of the lessor ceased, cannot be sustained for two reasons: (1) it was its duty to complete the work so begun; and (2) that duty was recognized, because it appears that sometime before the injury to the decedent, after the earth in the opening in the pavement had settled, the Home Land Company was notified of the condition and promised to correct it. We hold that, having voluntarily assumed to repair the filling station and having allowed a condition to be created from which patrons of the station might be injured, through its failure to complete the repairs, the lessor became liable for injuries sustained by persons lawfully on the premises. This proposition is sustained by many cases. *Marr* v. *Dieter*, 27 Ga. App. 711, 109 S. E. 532; *Miller* v. *Fisher*, 111 Md. 91, 73 Atl. 891, 50 L. R. A. (N. S.) 295; *Parker* v. *Jenkins*, 135 Misc. 666, 239 N. Y. S. 344; *Feeley* v. *Doyle*, 222 Mass. 155, 109 N. E. 902, L. R. A. 1916 F, 1121; *Horton* v. *Early*, 39 Okla. 99, 134 Pac. 436, 47 L. R. A. (N. S.) 314, Ann. Cas, 1915 D, 825; *Hill* v. *Liebman, Inc.*, 53 Ga. App. 462, 186 S. E. 431. However, in *Thomas* v. *Lane*, 221 Mass. 447, 109 N. E. 363, L. R. A. 1916 F, 1077, it was held that a landlord who gratuitously undertook to repair a railing and did so negligently was not liable to one not a party to the contract, and owed no duty to a tenant's invitee. This rule relates to a case affecting private residences, and not to a quasi public place such as a filling station where customers,

members of their families and guests are invited to enter and use the facilities afforded thereby.

Having held that the lessor was, under the circumstances of this case, liable for his negligence in permitting the filling station to remain in the condition shown by the evidence, the question of the extent of that liability to plaintiff's decedent arises. To determine this liability, we must decide whether he was an invitee or a mere licensee or trespasser. No contention is made that he was a trespasser, but it is contended that he was nothing more than a mere licensee, and that the only duty owed him, by either the lessor or lessee of the station, was not to wilfully or wantonly injure him. On the other hand, it is contended that as the guest of a customer of the station, he occupied the same relation as the owner of the car, was an invitee, and that both the lessor and the lessee owed to him the duty of keeping the station in a reasonable state of repair, and not having done so, they are liable to his personal representative for injuries sustained by reason thereof causing his death. We have not found that this question has been decided by this court, and our decisions on kindred questions throw little light upon the particular point. Generally, the decisions bearing upon this question relate to visits to railroad stations on business not connected with that for which the station is operated, and in most cases, such visitors have been held to be licensees and not invitees. *Hyde* v. *Atlanta & W. P. R. Co.*, 47 Ga. App. 139, 169 S. E. 854; *Kinnabrew* v. *Ocean Steamship Co.*, 47 Ga. App. 704, 171 S. E. 385; *Sinclair Automobile Service Corporation* v. *Morris*, 86 Fed. (2d) 298. The three cases above cited were all decided under a statute of the State of Georgia, which undertakes to define a licensee as "a person who is neither a customer, nor a servant, nor a trespasser, and does not stand in any contractual relation with the owner of the premises, and who is permitted expressly or impliedly to go thereon merely for his own interest, convenience or gratification. The owner of such premises is liable to a licensee only for wilful or wanton in-

jury." In *Murphy* v. *Huntley*, 251 Mass. 555, 146 N. E. 710, 37 A. L. R. 1447, it was held that one who goes to a public garage with the owner of a car stored there, to procure the car, is a mere licensee. These cases represent the extreme of the theory presented by the defendants, and are indeed strongly persuasive. On the other hand, the case of *Plummer* v. *Dill,* 156 Mass. 426, 31 N. E. 128, 32 Am. St. Rep. 463, decided in 1892, and referred to as a leading case, while it holds that "a person who enters a building containing offices, to inquire about a servant of the occupier of one of the offices, who keeps no servant's registry and who has no connection with such business, the building not being used or designed in any part for such purpose, is a mere licensee therein; and the owner is not liable for injuries received by her through the unsafe condition of the building," there runs through the opinion the thought that where a person visits a building for some purpose connected with the business there being carried on, there is an implied invitation. Speaking with approval of the rule in force in England, it is stated:

> "It is well settled there that to come under an implied invitation, as distinguished from a mere license, the visitor must come for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there. There must at least be some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the object of the visit may not be for the benefit of the occupant."

In the case at bar, it appears that the filling station was equipped with toilet facilities, and we cannot close our eyes to the fact, well known to all men, that these facilities are provided by operators of these stations, not only to accommodate their customers, but the traveling public as well, as a part of the business in which they are engaged. A filling station which affords such facilities has great advantages over one that does not,

and as a matter of practice, there is no restriction placed upon their use so far as the traveling public is concerned. In this view, no one will say that the customers of a filling station are not invited to use toilet facilities, because they are placed there for their convenience. If a customer is invited to use these facilities, does not the invitation extend to his guest? It would be strange indeed if the owner of an automobile driving into a filling station with members of his family, or with selected and invited guests, would be held to be an invitee, and the other occupants mere licensees, so that a different rule of liability for the condition of the station which might cause injury would be applied to the owner of the automobile and his guests or members of his family. We think the operator of a filling station equipped with toilets for public, as distinguished from private, use, impliedly, if not expressly, invites the traveling public to make use thereof, and that there is no distinction between its obligation and responsibility to the man who owns or drives a car into the station and his guest. We think this conclusion is supported by legal logic and plain common sense. Of course, this rule should be limited in its application to owners or operators of motor vehicles and their families or guests. We hold, therefore, that the lessor, Home Land Company was liable to Wingrove for an injury which resulted from its failure to restore the premises in question to a reasonably safe condition.

The remaining question is whether or not the jury, had the case been submitted to it, would have been warranted in finding that the death of Wingrove resulted from the injury sustained by him at the filling station on the night of May 2nd. The action of the trial court, in directing a verdict for the defendants, can only be sustained upon the theory that, had this particular question been submitted to the jury, and there had been a finding in favor of the plaintiff, such verdict should have been set aside. The point is raised by the defendants that Wingrove's conduct, subsequent to his injury, amounted to contribu-

tory negligence which would bar his administrator from recovery in this action. We do not understand that the doctrine of contributory negligence has any application. Contributory negligence, as generally applied, is negligence on the part of the injured person at the time of a given injury, bearing upon the injury itself, and not subsequent conduct. Be this as it may, Wingrove was not without responsibility for the care of the wound he received. It was his duty to exercise reasonable and ordinary care, and he failed in that duty. This lack of care was an intervening and probable cause of death developing after the injury. Had there been no such intervening lack of care, and blood poisoning developed from which death resulted, the injury sustained would have been considered as the proximate cause of death. *Allison* v. *City of Fredericksburg,* 112 Va. 243, 71 S. E. 525, 48 L. R. A. (N. S.) 93, was a case where, from a slight injury, sarcoma developed, necessitating the amputation of a leg, and recovery was denied. In *Jones' Admr.* v. *City of Richmond,* 118 Va. 612, 88 S. E. 82, where a wound admitted germs which produced lockjaw resulting in death, the injury was held to be the proximate cause of death, but this holding was sustained upon the theory that " * * * the city's alleged negligent act opened the way for the trouble that did not cease to operate until the fatal result was reached, without any intervening cause whatever, thereby making the injury the proximate cause of the death." In the case before us, there were intervening acts on the part of Wingrove which the evidence shows probably caused his death, and it, therefore, cannot be said that the injury sustained was the proximate cause of death. In the case at bar, the burden rested upon the plaintiff to show, not only the injury, and the defendants' connection therewith, and their liability therefor, but also to show that the death of Wingrove resulted from the injury so sustained. This, it may be admitted, is ordinarily a question of fact, and one for jury determination, but where it is shown by a strong preponderance of the evidence that, in all prob-

ability, the injury itself, had it received proper treatment, would not have resulted in death, and that in all reasonable probability death resulted from acts of the injured party which could have been avoided by him, the court, we think, was warranted in holding that, as a matter of law, the death of the plaintiff did not result from the injury sustained. This is a case wherein no one can be certain as to what would have been the result of the injury sustained by Wingrove, had he received prompt and approved treatment; but it clearly appears from the testimony that, while in some cases, death results from the most trivial wounds through infection and blood poisoning, even when there has been prompt treatment, the percentage of deaths, where a slight wound is given prompt and approved treatment, is very small indeed; from this it may be reasonably argued that, had Wingrove accepted the advice of his companion Davis and had the wound treated immediately after the accident, the strong probabilities are that it would not have resulted fatally. Instead of doing this, he seems to have pursued exactly the opposite course. He took no precautions whatever, and what he did served to aggravate rather than help his wound. He spent the night at different places in and around Fayetteville and Oak Hill, and paid no attention to his wounds. The black friction tape, which was placed around his arm, was allowed to get into the wound. About three o'clock in the morning, some character of salve was placed on the wound, and the same bandaged with gauze held on by adhesive tape. No antiseptic was used. For twenty-six hours, the wound was allowed to remain untreated by a physician, under conditions which made infection extremely probable, whereas, reasonable and prompt treatment would have made that infection improbable. While with the best treatment that could have been had, Wingrove might have died from these injuries, the chances are overwhelmingly against that assumption, had the wound been promptly and properly treated, and this being true, the overwhelming preponderance of prob-

abilities, created by the evidence, sustain the contention of the defendants that the death of Wingrove resulted, not from the injury, but from an infection of the wound arising from his conduct and inattention to the injury he received. The plaintiff has not sustained the burden which rested upon him to show that the death of his decedent was the result of the injuries sustained by him, and on this point alone, we think the trial court was warranted in directing a verdict for the defendants.

The judgment of the circuit court is affirmed.

*Affirmed.*