# GEORGE FJELLMAN v. S. HOWARD WELLER AND OTHERS.
## SOCONY-VACUUM OIL COMPANY, INC., APPELLANT.[1]

December 24, 1942.

No. 33,229.

[1]Reported in 7 N. W. (2d) 521.

*Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for appellant.
*Schmitt, Johnson & Farrish,* for respondent.

STREISSGUTH, JUSTICE.

Action to recover damages for personal injuries sustained as the result of an explosion of vapors in an unused, underground gasoline storage tank installed in a public alley in the city of Mankato.

Before the close of plaintiff's case, he voluntarily dismissed the action as to defendant city, and at the close of his case he voluntarily dismissed as to defendant S. Howard Weller, the owner of adjoining premises and lessee of the tank. The motion for a directed verdict of defendant Miller Motor Company, wholesale distributor for the defendant Socony-Vacuum Oil Company, Inc., was granted at the close of plaintiff's case. The court denied a similar motion made at the same time by the oil company. It thereupon offered proof in defense and, at the close of all the proof, renewed its motion, which was again denied. The jury returned a verdict for $10,000. The appeal is from an order denying the oil com-

pany's motion for judgment notwithstanding the verdict or for new trial.

Defendant Weller had for many years conducted a hardware store and tire and battery shop in a building owned by him in Mankato. About 1924 he contracted with the White Eagle Oil and Refining Company to sell its products, and that company thereupon installed a gasoline pump on the curb in front of his building and a connecting gasoline storage tank in a public alley on the side of his building. In 1930 this company installed a second pump and tank, which is the one here involved. This tank was also placed in the alley but back of the first tank. Licenses or permits for the installation and subsequent use of the pumps and tanks were in each instance applied for by agents of the oil company but issued by the city to and in the name of Weller. The license fees were paid by the oil company, and its employes installed the pumps and tanks.

At the time of the second installation, a formal lease was entered into between Weller and the oil company. Though the lease reserved an annual rental of one dollar, no rent was in fact ever demanded or paid. Weller was told at the time he signed the lease that the purpose thereof was to show that the property belonged to the oil company. He did not read the agreement and received no copy thereof.

The lease contained no covenant on the part of either party to make repairs. It contained a clause that the property was leased "only for the purpose of storage and distributing Petroleum Products purchased from * * * [lessor], and if used for any other purpose than that herein specified then * * * [lessor] shall have the right to declare this agreement null and void and said * * * [lessor] is hereby given the privilege and right without notice to * * * [lessee] to enter upon the premises * * *, and remove therefrom said equipment." Also in the lease was a covenant that the lessee "agrees to indemnify and save harmless said * * * [lessor] of and from any and all claims for liability for any and all loss, damage, injury or other casualty to persons or property caused or

occasioned by any leakage, fire or explosion of or from said equipment, or the appliances connected or used therewith, or through any imperfection in the construction, installation or operation of the same, whether due to negligence of the * * * [lessor], or otherwise."

In 1934 defendant Socony-Vacuum Oil Company, Inc. acquired all the property theretofore owned by the White Eagle Oil and Refining Company, including the pumps and tanks referred to, and the lease was formally assigned to and assumed by the Socony company, the successor corporation. Each of the oil companies will be referred to indiscriminately as the "oil company," except as a distinction becomes necessary.

Weller continued to purchase gasoline directly from the oil company up to and including December 1938. He used the tank nearest the street for "Mobilgas" and the other tank for "Metrogas," a lower priced product. His last purchase of "Metrogas" was on June 15, 1937. About the same time he notified the company that he would not "use the Metro any more or use that tank [the one here involved], * * * it wasn't of any use" to him. Shortly thereafter all gasoline was pumped out of the second tank, and it was never refilled. Weller did, however, continue to buy and sell "Mobilgas." Notwithstanding that "Metrogas" was no longer being sold, neither the pump used in dispensing it nor the tank in the alley was removed.

In January 1939 the oil company discontinued selling its products directly to retailers at Mankato. Instead, it made a contract with defendant Miller Motor Company to act as its exclusive distributor in the Mankato territory, under the terms of which the oil company was prohibited from making direct sales to retailers in that territory. The Miller company thereafter sold and delivered the products of the oil company on its own account and as an independent dealer rather than as an agent of the oil company, continuing such practice until the time of the trial. Weller had no further dealings directly with the oil company, but he continued to use the "Mobilgas" pump and connecting tank, the pump

being painted from year to year by the company without request from or expense to him. The original lease was not formally cancelled. No "Metrogas" was sold to Weller by the Miller company, and the second pump and tank remained unused at all times subsequent to 1937.

On November 17, 1940, plaintiff, George Fjellman, then 14 years of age, with two friends, Donald Scheerz, 12 years of age, and Thomas Clements, 10 years of age, were walking down the street leading to the alley. Plaintiff was lighting some paper matches and throwing them up in the air, and the boys watched the pattern of smoke made by the matches as they fell without particularly observing where they landed. Shortly afterward they turned into the alley. When they were about in the vicinity of the unused storage tank, of which they were unaware and which they did not observe, plaintiff threw up a match, and within a moment an explosion occurred.

Black smoke and debris caused by the explosion went as high as the two-story Weller building. The explosion was caused by the ignition of vapors in the tank and was confined to a blast through the fill pipe, the tank and fill pipe remaining intact. Plaintiff received the full force of the blast on his face and hands. The nature of his injuries indicated definitely that his position at the time of the explosion was directly over the pipe. After the explosion he was found lying near the entrance of the alley into the street.

Dr. L. A. Ford, an expert, explained in some detail the action of gasoline and its vapors in tanks and the persistence of explosive vapors in tanks from which gasoline has been removed, such vapors being heavier than air. He testified there would be a small quantity of vapors escaping from the tank at all times under the circumstances here existing and that an explosion could occur, either in the tank or at the outlet, through actual contact between the vapor and a flame.

The tank which exploded had a three-inch fill or intake pipe with a hinged cover, which when closed projected about three

inches above the surface of the alley. This cover originally had a protruding iron lip which fitted over an opening on the intake pipe, thereby permitting a padlock to be inserted. At the time of the accident, and for at least three years prior thereto, the lip was broken off so that the cover could not be locked. There was no evidence, however, that the break had ever been called to the attention of the oil company. The intake pipe and cover were not painted and had no marks on them to indicate the presence of a gasoline tank. They resembled and could easily be mistaken for the pipes and covers used by the city water · department throughout the city. Shortly after the explosion, a police officer found the cover to the intake pipe lying open and slightly imbedded in the snow. The lip through which the padlock was inserted was broken off.

Plaintiff denied seeing the intake pipe or having intentionally thrown a match into it. Both Donald and Thomas denied seeing plaintiff open the iron cover or investigate the fill pipe. Leading cross-examination of the boys gave substantial support to appellant's theory that plaintiff's friends saw him drop a match near the fill pipe and called to him, "Don't do that," but, when questioned directly as to whether they saw him in the act of dropping the match, they consistently denied it.

■ The general rule unquestionably is that a bailor or lessor of personal property is not liable to third persons for negligence of his bailee or lessee in the use of the property. 1 Dunnell, Dig. & Supp. § 731d, and see 4 *Id.* & Supp. § 5369; Restatement, Torts, c. 14, §§ 388-408; 6 Am. Jur., Bailments, p. 395, §§ 312, 313. This rule, however, is strictly limited to cases where the lessor or bailor has relinquished all control over the .instrumentality lent or leased, the entire doctrine being based upon the premise that the lessor or bailor has no voice and no control over the instrumentality and therefore cannot be held liable solely by reason of the ownership thereof. See Gillispie v. Bohling, 107 Neb. 357, 186 N. W. 85. The evidence here shows that from the beginning the responsibility for the maintenance and repair of the equipment

was assumed by the lessor, and that at no time had such responsibility been delegated to the lessee. Weller took no part in the installation of the original pump and tank, did not select the exact site therefor, and did not supervise the installation. All this work was done by the oil company. The company not only installed the pumps and tanks, but repaired the pumps from time to time and replaced one of them, as well as the handle on another, changed the style of globes on the pumps, renewed the company's insignia, painted the pumps yearly, and on numerous occasions pumped water from the underground storage tanks. All of the maintenance and repair work mentioned was done in the usual course of appellant's business as part of its service to its retail distributors. Likewise, the filling of the tanks, with the incidental unlocking and locking of the covers on them, was attended to exclusively by the company's drivers. Weller never had any part in filling the tanks and had no keys to the locks thereon so far as the evidence shows. Frequently it was necessary for those filling the tanks to break off accumulations of ice and snow to permit the opening of the lid. The tank in which the explosion occurred was never used by the Miller Motor Company, so the only person responsible for its condition at the time of the accident was the oil company. Having thus assumed responsibility for the maintenance of equipment, the oil company cannot now avoid liability by claiming that under the terms of the lease the duty to repair was upon Weller and not upon it.

Although a landlord, in the absence of a covenant to that effect, is ordinarily not bound to repair or improve leased premises, yet, if he assumes to do so and performs the work so negligently as to cause an injury thereby, he is responsible. 4 Dunnell, Dig. & Supp. § 5369; Restatement, Torts, §§ 357, 362; Johnson v. Theo. Hamm Brg. Co. 213 Minn. 12, 4 N. W. (2d) 778; Wood v. Prudential Ins. Co. 212 Minn. 551, 4 N. W. (2d) 617; Myhre v. Schleuder, 98 Minn. 234, 108 N. W. 276; Rushing v. Texas Co. 199 N. C. 173, 154 S. E. 1; Marr v. Dieter, 27 Ga. App. 711, 109 S. E. 532; Miller v. Fisher, 111 Md. 91, 73 A. 891, 50 L.R.A.(N.S.) 295, and note; Parker v.

Jenkins, 135 Misc. 666, 239 N. Y. S. 344; Horton v. Early, 39 Okl. 99, 134 P. 436, 47 L.R.A.(N.S.) 314, Ann. Cas. 1915D, 825; Hill v. Liebman, Inc. 53 Ga. App. 462, 186 S. E. 431. The same rule should apply to a lessor of chattels.

So, where a lessor of a filling station and equipment reserves exclusively to itself the right to enter upon the premises to make additions and alterations, it alone is liable for damages resulting from its own negligence. Rushing v. Texas Co. *supra*. And where, as here, the lessor, in furtherance of its own business, installs the equipment and continuously thereafter maintains and repairs it, obviously it is liable for negligence attributable solely, or in a substantial degree, to its acts or omissions. It is immaterial that the lease is silent on the question of repairs or expressly exempts the lessor from any obligation to make repairs. Wingrove v. Home Land Co. 120 W. Va. 100, 196 S. E. 563, 116 A. L. R. 1197, 3 N.C.C.A.(N.S.) 290.

Appellant counters with a statement in 32 Am. Jur., Landlord and Tenant, p. 546, § 677, that "the fact that the landlord makes repairs does not impose on him a duty to keep the demised premises in repair or liability for damages for injuries caused by a failure to keep the premises in repair." To this proposition is cited the case of Phelan v. Fitzpatrick, 188 Mass. 237, 239, 74 N. E. 326, 327, 108 A. S. R. 469, in which it is said:

"The fact that the defendant [landlord] voluntarily undertook on one occasion at the request of the plaintiff's mother to repair the railing with a hammer and nails which she furnished him would not constitute an admission of liability on his part or render him liable if the railing afterward gave way. It was a gratuitous act on his part which imposed no liability on him."

The distinction between such a situation and the one here existing is obvious. The repairs in the instant case were not casually made on a single occasion, but as part of a continuous and uninterrupted policy of the company to service its own equipment, principally, if not exclusively, for its own benefit. This service

cannot be called gratuitous or casual. (See Feeley v. Doyle, 222 Mass. 155, 109 N. E. 902, L. R. A. 1916F, 1121.) It was for the mutual benefit of both lessor and lessee and was continuously rendered by the oil company over a period of many years.

But, even though the service of repairs and maintenance be termed a gratuity, that fact would not absolve the oil company from liability for its own negligence in performing the service. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." Glanzer v. Shepard, 233 N. Y. 236, 239, 135 N. E. 275, 276, 23 A. L. R. 1425; Parker v. Jenkins, 135 Misc. 666, 239 N. Y. S. 344.

Broughton v. Standard Oil Co. 201 N. C. 282, 159 S. E. 321, relied upon by appellant, is also distinguishable. In that case there was no evidence that the company ever assumed the duty or responsibility of making repairs.

■ There is still another reason why the duty to use care existed in this case. The underground tank in which the explosion occurred was installed in a public alley. It had not been in use since 1937. In June of that year Weller purchased his last order of "Metrogas" and shortly thereafter pumped out all the gas from the tank. At the same time he notified appellant that he would use no more "Metrogas" and that the equipment was no longer of any use to him. Notwithstanding this notice, appellant did not remove the discontinued pump and tank, but permitted them to remain on the street and in the alley and to become in disrepair. From the time of such notice the relationship between Weller and the company as to this particular equipment was no longer that of lessor and lessee, and the full responsibility for the proper maintenance thereof devolved upon appellant as owner thereof, as the trial court correctly charged.

The tank here involved having been installed in a public alley, it was the owner's clear duty regularly to inspect and properly to maintain it so as to eliminate danger to travelers in the alley, or to remove it after its use had been abandoned.

In Sinclair Refining Co. v. Gray, 191 Ark. 175, 83 S. W. (2d) 820, the lock on an underground gasoline tank had been broken off and a four-year-old boy attracted to the fill pipe raised the top or flap of the pipe and struck a match, causing an explosion which seriously injured him. The equipment involved had originally been leased by the appellant to the owner of the premises, but the lease agreement had been cancelled. The company, however, did not remove its tanks and equipment, but permitted one Russell to use the same in the distribution of its gasoline. The proof showed that "the owner of the tanks and pipes permitted them to remain on the premises where they were located unguarded, and with the lock broken off so that the cap was not securely fastened." The court held that it was not important that the man who delivered the gasoline was not an agent of the company but the agent of an independent dealer, saying (191 Ark. 178, 179, 83 S. W. [2d] 820, 822):

"* * * if he had been a stranger, the appellant would be liable because, if it left the equipment, which was to be used to store and deliver gasoline in an unsafe condition, then any one could put gasoline in the pipes, and if a stranger did, and injury resulted, the appellant would be liable because it permitted its equipment to be in such condition that it could be used by any one, and the only purpose of its use was to store a dangerous agency."

Another reason often advanced for protecting the lessor against the negligence of a lessee is the former's inability to gain access to the premises to make the necessary repairs. But that element is entirely lacking here, the tank being in a public alley. This court has held that where a lease authorizes entry by a landlord for the purpose of making repairs, even though there is no covenant or obligation on his part to make repairs, he is responsible for failure to repair, since the reason for suspending his obligation to do so is gone. "Any provision which retains in the lessor power or ability to perform the duty is sufficient to prevent its suspension. He then has the control upon which the duty is

based." Paine v. Gamble Stores, Inc. 202 Minn. 462, 467, 279 N. W. 257, 259, 116 A. L. R. 407. And see Appel v. Muller, 262 N. Y. 278, 186 N. E. 785, 89 A. L. R. 477; 47 Harv. L. Rev. 357.

■ If the duty of inspection was appellant's, as under the facts here it clearly was, its failure, during a period of three years, to observe the broken lock on the cover of the tank and the presence of vapors was sufficient to establish negligence on its part. Goar v. Village of Stephen, 157 Minn. 228, 196 N. W. 171; Lawrence v. Scranton City, 284 Pa. 215, 130 A. 428, 41 A. L. R. 454.

A public alley is not a storeroom for dangerous equipment. Rothenberger v. Powers Fuel, F. T. & S. Co. 148 Minn. 209, 181 N. W. 641. Appellant doubtless had a right to install the underground tank in the alley under license from the city; but, when the use thereof was abandoned, the tank should have been removed within a reasonable time, or it should have been so sealed as to remove any reasonable probability of an explosion from gasoline remaining therein or from vapors generated therefrom.

■ The covenant of indemnity contained in the lease did not have the effect of transferring the lessor's liability for negligence to the lessee. A party injured by the negligence of another must in any case seek his remedy against the person who caused the injury, and such person alone is liable. Higgins v. Western Union Tel. Co. 156 N. Y. 75, 50 N. E. 500, 66 A. S. R. 537. In Minnesota, as in most other jurisdictions, a party injured by negligence would not even have a right to join the indemnitor as a party defendant in his action. "A third person, although he may have an interest in the subject matter of the indemnity, and a right of action against the indemnitee, not being a party to the indemnity contract, is not entitled to sue thereon." 31 C. J., Indemnity, p. 457, § 57; Moore v. Mann, 130 Minn. 318, 153 N. W. 609. Nor would such covenant either enlarge or lessen the duty of either party in respect to repairs. It was intended only as security to the lessor against loss or damage regardless of whose breach of duty caused the same.

■ The question of proximate cause presents no difficulty. If appellant was negligent in failing to keep the cover of the underground tank in repair, or to discover its broken condition, or to remove it from the public alley after its use had been abandoned, such negligence was a proximate cause, notwithstanding we assume that Weller was also negligent in the same respect. The doctrine of an efficient intervening proximate cause does not apply, for Weller's negligence, if any, was joint and concurrent with that of appellant.

■ Nor is it important that appellant could not have foreseen that injury would result from its negligence in the unusual way in which it did. While the test of foreseen or foreseeable consequences is applied generally in Minnesota, as it is in many other jurisdictions, in determining proximate cause, such test does not require that the negligent person should have been able reasonably to anticipate the injury in the precise form in which it in fact occurred, or to anticipate the particular consequences which actually flowed from his act or omission. Negligence is determined according to the probability of some injury to someone rather than to the likelihood of the occurrence of the particular injury which did in fact result. 38 Am. Jur., Negligence, p. 713, § 62; 4 Dunnell, Dig. & Supp. § 7000.

As said in Christianson v. C. St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641:

"What a man may reasonably anticipate is important, and may be decisive, in determining whether an act is negligent, but is not at all decisive in determining whether that act is the proximate cause of an injury which ensues. If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent at all; but, if the act itself is negligent, then the person guilty of it is equally liable for all its natural and proximate consequences, whether he could have foreseen them or not."

In Reichert v. Minnesota, Northern N. G. Co. 195 Minn. 387, 392, 263 N. W. 297, 300, where a 10-year-old boy was injured from the explosion of an empty drum containing a residue of explosive paint, the explosion being caused by a spark from a hammer and cold chisel which the boy was using on the drum, this court, speaking through Mr. Justice Loring, said:

"If the act was negligent, the injury to young Reichert followed in an unbroken natural sequence in the ordinary and natural course of events and without an intervening efficient cause. Leaving the drum in the condition described was a substantial factor in causing the injury."

So here, to adopt the exact words of the court in Sinclair Refining Co. v. Gray, 191 Ark. 175, 180, 83 S. W. (2d) 820, 823, *supra,* "but for the negligence of appellant in leaving the lock broken and the pipe unguarded, the injury could not have occurred."

A case of the kind here presented parallels the case of a gas company which negligently permits gas to escape from a defective gas main, with the result that when someone strikes a match an explosion results. See Koelsch v. Philadelphia Co. 152 Pa. 355, 25 A. 522, 18 L. R. A. 759, 34 A. S. R. 653; Lawrence v. Scranton City, 284 Pa. 215, 130 A. 428, 41 A. L. R. 454.

If, as said in Lawrence v. Scranton City, *supra,* the use of a match on the street to light a cigarette or cigar should be anticipated as a reasonable use of the highways, so should the striking of a match for any other purpose, either serviceable or playful.

We see no distinction between this case and that of Sedita v. Steinberg, 105 Conn. 1, 134 A. 243, 49 A. L. R. 154. There a gasoline tank was maintained beneath the pavement of a city street and the intake pipe left uncovered. Plaintiff fired a toy pistol into the intake, causing an explosion. The court said (105 Conn. 5, 134 A. 244):

"The defendants were chargeable with knowledge of the natural and probable consequences of maintaining such a structure in the

pavement * * * and of the danger of an explosion by the dropping of a lighted match or cigarette, by the fireworks which are commonly set off in the streets at that time of year, by the play and pranks of children upon this open pavement * * *, by the backfire of an automobile motor, and by many other not improbable happenings which might serve to ignite these inflammable gases. All these were things for the owners of this tank to take account of.

* * * * * *

"If the owner of a thing which is capable, in its nature, of doing injury to persons, leaves it exposed and unguarded in a public place, and one be injured, as a natural and probable consequence, without fault on his own part, the owner is responsible. The injury * * * will not be considered too remote if, in the usual experience of mankind, the result ought to have been apprehended."

Here there was evidence not only that the lip on the cover of the tank had been broken for a period of three years, but that the cover was open at the time of the explosion. The danger from the explosion was not removed by the fact that the tank was no longer in active use, because, as shown by the proof and as is commonly known, explosive gasoline vapors will remain in underground tanks of this type for an indefinite period after the tanks have been drained. Appellant, engaged as it was in the distribution of gasoline, was charged with knowledge that if the intake pipe was not properly closed these vapors would escape and would explode if they came in contact with a flame, and that such flame might come from a match. It cannot, under these circumstances, be argued that the accident was not one which appellant had reasonable ground to anticipate.

On the issue of contributory negligence, appellant argues that the only plausible explanation of the explosion is its theory that plaintiff, through curiosity, held a lighted match over the intake pipe to enable him to look down the pipe or that he deliber-

ately dropped a lighted match into the tank. The jury, however, accepted the contrary version that the dropping of the match into the pipe or near its opening was purely accidental and done by plaintiff while he was walking through the alley without being aware of the presence of the intake pipe. Granted that appellant's version appears more plausible, yet plaintiff's explanation is not an impossible, but an entirely probable, one, and it was for the jury to decide, after hearing all the testimony, just how the accident happened.

In Lawrence v. Scranton City, 284 Pa. 215, 130 A. 428, 41 A. L. R. 454, *supra*, it was held that the striking of a match to light a cigarette in proximity to a manhole was not contributory negligence even though the presence of gas might have been detected by smell. So, here, in the absence of proof that plaintiff knew of the location of the tank and the presence of explosive vapors, the mere lighting of a match by him, even in play, could under no circumstances be held contributory negligence.

We therefore conclude that appellant was not entitled to judgment notwithstanding the verdict.

■ On the issue of negligence, the trial court instructed the jury in part as follows:

"In view of the fact that the Socony-Vacuum Oil Company was the owner of this equipment, and in view of the fact that the equipment was in a public street or alley, you are instructed that it was the duty of the Socony-Vacuum Oil Company at the time and place in question, and prior to that time, to keep its equipment in a reasonably safe condition and to exercise ordinary, reasonable care in so doing."

Abstractly, this instruction was incorrect as being opposed to the general rule that a lessor of chattels who has surrendered complete control thereof to his lessee is not responsible thereafter for its safe condition. But here the element of surrender of control was wholly lacking. The testimony of both parties established without contradiction that the oil company had installed the

equipment in a public alley accessible at all times and had continuously thereafter assumed full responsibility for the repair and maintenance thereof. Its duty was therefore correctly defined by the court's instruction even though the court ignored the lease and actually told the jury in subsequent instructions that the "lease was received [in evidence] perhaps more for purposes of law than for purposes of your consideration."

■ Nor can any error be predicated upon the instruction:

"* * * you * * * need not determine what Mr. Weller's duties were. He is now no longer a party to the case. It is for you to determine the question of the duties of the Socony-Vacuum Oil Company and the duty of the plaintiff. * * * as to this lease that has been received, you are not to determine whether there is any liability on the part of Mr. Weller by reason of that lease but only whether there is any liability on the part of the defendant Socony-Vacuum Oil Company."

Appellant's duty in respect to the repair and maintenance of the equipment was established by undisputed testimony as a matter of law. It was therefore immaterial whether Weller was also under duty to plaintiff. If the negligence of both Weller and appellant was shown, it was concurrent negligence, for which either would be liable. The case having been previously dismissed as to Weller, it was entirely proper for the court so to advise the jury and to caution them that such dismissal could not affect appellant's responsibility for its own negligence. This in effect is what the trial court did.

■ After charging generally on the law of contributory negligence and the standard of care required of an injured person, the trial court gave specific instructions as to the degree of care required of a boy of plaintiff's age. Appellant does not challenge "the correctness of the part of the charge to the effect that the standard of care for plaintiff was that exercised by a boy of his own age," but it complains because the court did not go further and differentiate "between contributory negligence in the case of

merely throwing matches in the air and deliberately dropping the match in the tank." If appellant desired a more specific charge upon its theory of the case, it was its privilege to draft one and request the giving thereof. The court's instruction being a correct statement of the law of contributory negligence, no error can be predicated upon its failure to submit appellant's theory *in extenso* in the absence of a request.

■ Upon cross-examination of Donald Scheerz, the 12-year-old companion of plaintiff, he testified that he preceded plaintiff in walking down the alley and that at about the instant plaintiff reached the locality of the fill pipe he turned and called to plaintiff, "Don't do that"; that he "screamed" at plaintiff; that he was afraid something might happen. Plaintiff's counsel on redirect examination pleaded surprise and was permitted by the trial court to impeach the witness by showing that at a conference the preceding evening he had told counsel he did not say anything to George about throwing matches. Considering the youth of the witness and the leading nature of the cross-examination, the matter of permitting impeachment by showing contradictory statements was entirely within the discretion of the court, and this discretion was properly exercised. 6 Dunnell, Dig. & Supp. § 10356.

■ Evidence of plaintiff's mental condition, his change of personality, and his change of attitude toward others was properly admissible on the issue of damages. 6 Wigmore, Evidence (3 ed.) §§ 1715, 1791; 2 Dunnell, Dig. & Supp. § 3292, *et seq.*

The testimony showed that as a result of the explosion plaintiff received very severe burns and scars which caused noticeable disfigurement of his face. He was permitted to testify as to his consciousness of this disfigurement and to describe certain of his mental reactions to the discolored condition of his face and to what he imagined or concluded others thought or said about him when they observed him. The testimony was admissible as indicating his mental attitude and his feelings toward others. The acts had a definite relationship to the extent of shock to plaintiff

and to his alleged change of personality following his injuries, and they fall within the rule that "where the motive, belief, or intention with which an act is done is material, a party may show the fact directly by his own testimony." Henslin v. Wingen, 203 Minn. 166, 170, 280 N. W. 281, 282; 2 Dunnell, Dig. & Supp. §§ 3293, 3294.

"That the statements were made is the important thing, and they are admissible in evidence over the objection that they are hearsay because they are not offered for their probative value. The rule applied by this court in Lepak v. Lepak, 195 Minn. 24, 261 N. W. 484, and advocated by 6 Wigmore, Evidence (3 ed.) § 1766, is that if the fact that the statement was made is material to an issue in the case, the statement is admissible. It is only when a witness attempts to prove the truth of a given proposition by repeating what another said that his testimony is deemed hearsay." Corcoran v. Teamsters & Chauffeurs Joint Council, 209 Minn. 289, 296, 297 N. W. 4, 7; 6 Wigmore, Evidence (3 ed.) § 1766.

Furthermore, the statements made by plaintiff were merely cumulative, other witnesses having testified to the statements made by the boy to them from time to time.

We have examined the other assignments of error as to the admission and rejection of testimony but find no prejudicial error therein.

■ Nor can this court find that a verdict of $10,000 for injuries of the character and extent sustained by plaintiff was excessive. The full force of the explosion through the fill pipe of the gasoline tank struck plaintiff, and he was thrown a considerable distance. Specific injuries consisted of first- and second-degree burns about his hands, face, eyes, cheeks, lips, and tongue, and of the inside, as well as the outside, of his mouth. Foreign matter was driven into his face and into his tongue and lips, and there were burns with a lot of debris so deeply imbedded in them that it was not possible to remove all of it without damage to the skin tissue. The result was a permanent discoloration of both hands

and face which made plaintiff an object of curiosity. Since the accident plaintiff has had difficulty with eruptions on his face and has suffered from severe headaches, dizziness, and poor vision. There was both expert and lay testimony as to an entire change of personality in him following the accident. We have no hesitancy in declaring that the jury was reasonable in its estimate of the damages sustained.

Affirmed.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.

