Daniel **RUBINSTEIN**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE; Frederick Hubbard, Director, Baltimore City Hospitals; Wilbur J. Cohen, Secretary of Health, Education and Welfare; Robert Q. Marstom, Director, National Institutes of Health; and Gerald D. LaVeck, Director, National Institute of Child Health and Human Development.**

Civ. No. 20268.

United States District Court
D. Maryland.

Jan. 15, 1969.

Robert C. Prem, Baltimore, Md., for plaintiff.

James M. Aycock, Asst. City Solicitor, and David L. Bowers, Baltimore, Md., for Mayor and City Council of Baltimore and Frederick Hubbard, Director, Baltimore City Hospitals, Alan B. Lipson, Asst. U. S. Atty., Baltimore, Md., for Gerald D. LaVeck, Director, National Institute of Child Health and Human Development, defendants.

FRANK A. KAUFMAN, District Judge.

For the purpose of giving assistance to both institutions and individuals engaged in research aimed at the eventual treatment and prevention of disease, Congress has authorized the Surgeon General of the Public Health Service to "[m]ake grants-in-aid to universities, hospitals, laboratories, and other public and private institutions, and to individuals for such research or research training projects" that are recommended by certain advisory councils. 42 U.S.C. § 241(d). Acting pursuant to his power to promulgate "regulations necessary to the administration of the [Public Health] Service," 42 U.S.C. § 216(b), the Surgeon General, with the approval of the Secretary of the Department of Health, Education and Welfare, has defined the terms and conditions of grants for research projects. See Title 42, Chapter 1, C.F.R. Part 52.

Following the procedures set out in those regulations, Baltimore City Hospitals, on May 25, 1967, applied for a grant of approximately $109,000 to study various hypotheses on the nature of aging by organ and tissue transplant experiments. Thomas J. Krizek, M.D., Assistant Chief of Surgery and Chief of the Division of Plastic Surgery of the Baltimore City Hospitals, was listed in this application as the Principal Investigator. Daniel Rubinstein, Ph.D., a research biophysicist in the Department of Surgery, was listed as Co-Investigator. In March, 1968, Grant 1–R01–H.D. 0330–01 ("the grant") was issued by the National Institutes of Health (N.I.H.), through its subdivision, the National Institute of Child Health and Human Development, to Baltimore City Hospitals as grantee, with Dr. Krizek named as Principal Investigator and Dr. Rubinstein as Co-Investigator.[1]

During the summer of 1968, Dr. Krizek decided to leave Baltimore City Hospitals and take a position at the Yale University School of Medicine. On August 31, 1968, the Grantee notified N.I.H. that Dr. Krizek desired to continue research on the project at Yale and stated that it desired to terminate the grant as of September 30, 1968, because it did not wish to nominate another principal investigator for the project at Baltimore City Hospitals. John McDougall, Associate Director for Program Services of the National Institute of Child Health and Human Development, responded in a letter dated September 25, 1968. McDougall informed Frederick Hubbard, Director of the grantee hospitals, that a request for transfer of the grant to Yale University was under administrative review and asked that the grant be permitted to continue at Baltimore City Hospitals until that review was completed. Hubbard agreed to this as an interim measure provided that Dr. Richard Steenburg, Chief of Surgery at the grantee hospitals, would be the principal investigator for the grant until N.I.H. rendered a decision on the Yale transfer request. This condition was accepted and, subsequently on December 9, 1968, McDougall informed Hubbard that the Yale request for a transfer of the grant had been agreed to by N.I.H. December 31, 1968, was set as the date of termination of the grant at Baltimore City Hospitals.

---

1. The Surgeon General is given the power to act through the Institute of Child Health and Human Development in making Section 241 grants for research which is a function of that institute, by 42 U.S.C. § 289g. Section 289g provides in part:

The Surgeon General shall, through an institute established under this part, carry out the purposes of section 241 of this title with respect to the conduct and support of research which is a function of such institute, except that the Surgeon General shall, with the approval of the Secretary, determine the areas in which and the extent to which he will carry out such purposes of section 241 of this title through such institute or an institute established by or under other provisions of this chapter, or both of them, when both such institutes have functions with respect to the same subject matter.

Although the termination of the grant at Baltimore City Hospitals and the transfer to Yale University was agreed upon by N.I.H., the grantee, Dr. Krizek and Yale, it was not acceptable to Dr. Rubinstein. Dr. Rubinstein instituted in this Court this action for a declaratory judgment of his rights in the grant and injunctive relief to prevent the transfer of the grant to Yale. The plaintiff moved, ex parte, for a temporary restraining order until such time as this Court ruled on his requests for equitable relief. Since this Court was able to set a date for a hearing before the grant to Baltimore City Hospitals was to be terminated, the ex parte motion for a temporary restraining order was denied. Oral argument was heard on December 31, 1968, and at the close of the hearing this Court denied plaintiff's requests for equitable relief.[2]

Dr. Rubinstein's claim, in short, is that he, rather than Dr. Krizek, was really the Principal Investigator of the grant project. Dr. Rubinstein alleges that he originated the concept of the project and has always had sole responsibility for its conduct,[3] and that Dr. Krizek, on the other hand, was to be only a figurehead with no authority over the project. The plaintiff notes in this respect that the grant papers indicate that, while Dr. Krizek was to devote only a small part of his time to the project and was to receive no salary, Dr. Rubinstein was to work full time on the project and was to receive from N.I.H. a salary of $13,500 per year. The plaintiff claims

that all this was understood and agreed upon by Baltimore City Hospitals when it submitted its application for the grant. After Dr. Krizek decided to accept a position at Yale, Dr. Rubinstein states that he communicated with N.I.H. and asked that he be allowed to continue the grant project at Baltimore City Hospitals or elsewhere.[4] Although Dr. Rubinstein offered to submit evidence in support of his allegations to N.I.H. and asked for N.I.H. to hold a hearing, the plaintiff alleges that the latter approved the transfer of the grant without affording him a hearing. This action by N.I.H. is claimed by the plaintiff to be arbitrary and capricious and contrary to the regulations applicable to research grants set forth in 42 C.F.R. Part 52. Since there is no agency appeal of the decision by N.I.H. adverse to plaintiff's position, he came directly to this Court.

In the light of 42 U.S.C. § 289g, it is clear that the delegation of decision-making power in this case by the Surgeon General to the National Institute of Child Health and Human Development is authorized by Congress. Furthermore, the plaintiff does not challenge the constitutionality of either Section 241 or the implementing regulations set out in Part 52; indeed, he concedes that those regulations are valid. Rather, he asserts that the statute and regulations have given him a vested right in the grant and that that right has been unlawfully taken away from him by the action of the defendants in terminating the grant at Baltimore City Hospitals and trans-

2. The plaintiff brought this suit against the Mayor and City Council of Baltimore City, Frederick Hubbard, Wilbur J. Cohen (the Secretary of the Department of Health, Education and Welfare), Robert Q. Marstom (the Director of N.I.H.) and Gerald D. LaVeck (the Director of the National Institute of Child Health and Human Development). Service of process was not made on either the defendants Cohen or Marstom. The other defendants and the plaintiff conceded, however, that those two defendants were not necessary parties to the resolution of this suit. This Court therefore, with the consent of the other defendants and the

plaintiff, dismissed the suit with respect to defendants Cohen and Marstom.

3. Plaintiff attached to its Motion for a Temporary Restraining Order letters from four researchers stating that Dr. Rubinstein conceived the ideas underlying the grant.

4. Dr. Krizek arranged for Dr. Rubinstein to be offered a faculty position at Yale, where he could continue work on the grant project. He declined to do so, however, because, he claims, Dr. Krizek has falsified significant scientific data on the project, and this makes continued collaboration between the two impossible.

ferring it to Yale University. The narrow question before this Court is whether such a right in the plaintiff is created in the statute of regulations. Inasmuch as Section 241 merely authorizes the Surgeon General to make grants for certain research projects, the regulations in Part 52 must be examined to determine whether plaintiff's argument has merit.

The regulations which cover the transfer and termination of grants for Section 241 research projects are clear and explicit. If the grantee desires to terminate the grant, as Baltimore City Hospitals did in this case, it may follow two simple routes. First, it may terminate the grant by agreement with the Surgeon General. Section 52.15 of the regulations provides that:

"(a) *Discontinuance by agreement.* Whenever in the judgment of the Surgeon General and the grantee continuation of an approved project would produce results of no value in furthering the purposes of § 52.10, grant support shall be terminated."

In addition, the regulations provide that the grantee need not even obtain the agreement of the Surgeon General (or his authorized agent) in order to terminate the grant, for Section 52.15(c) sets forth the alternative method of termination by the grantee at will, whenever it so desires:

"(c) *Termination by the grantee.* A grantee may at any time terminate or cancel its conduct of an approved project by notifying the Surgeon General in writing setting forth the reasons for such termination."

■ It is beyond question that the purpose of these regulations is to permit, in the simplest possible ways, a grantee who no longer wishes to continue a project subsidized by an N.I.H. grant to terminate the grant. Indeed, the Surgeon General has given the grantee the right, in Section 52.15(c), to terminate the grant *at any time,* even over the objec-

tion of the Surgeon General himself. The plaintiff has not pointed to any statute or regulation that gives the Principal Investigator or anyone else the right to prevent this discretionary act on the part of the grantee in this case.[5] Thus, even if the plaintiff were the Principal Investigator, he would have no right to enjoin Baltimore City Hospitals from terminating the grant.

■ Turning to the plaintiff's next argument, that transferring the grant violated his personal rights, it is of course apparent that the Surgeon General could have accomplished the same result without serious challenge by a two-step operation rather than by a direct transfer: he could have terminated the grant, with the agreement of Baltimore City Hospitals, under Section 52.15 (a), and then have issued a new grant, for exactly the same project, to Yale University. In any event, the one-step procedure which the Surgeon General chose to follow is sanctioned by the regulations. Section 52.14(f) provides:

"(f) *Award for continuation of project under new grantee.* The Surgeon General, upon application in accordance with the provisions of § 52.12 and without further action by a Council or other body, may make a grant to any institution or other person eligible under § 52.11 for continuation of a currently supported project for which a grant was previously made to another institution or person, provided he finds that the change in the conduct of the project is consonant with the previous evaluation and approval of the project under § 52.13."

The procedure set out in this regulation is precisely the one used by the Surgeon General, acting through the National Institute of Child Health and Human Development, in this case. The power to transfer an ongoing grant is vested exclusively in the Surgeon General; that regulation does not purport to establish

---

5. It is to be noted that plaintiff has stated that he does not claim that the termination of the grant was prompted by

any discriminatory motive on the part of the grantee.

any rights in the Principal Investigator or any staff member.

 Finally, the plaintiff points to Section 52.21 of the regulations, which provides:

"§ 52.21 *Principal investigators.*

All grant awards shall be subject to the condition that the principal investigator designated in the application as responsible for the conduct of the approved project shall continue responsible for the duration of the project period. Whenever any such investigator shall become unavailable for any reason to discharge this responsibility, the grant shall be terminated and an accounting rendered as provided in § 52.15 *unless the grantee replaces such investigator with another person found by the Surgeon General to be qualified to direct and conduct the approved project.*" (Emphasis added.)

This Court cannot accept the plaintiff's argument that this regulation creates any vested rights in the Principal Investigator. Its language—particularly the italicized clause—makes it clear that this section is designed to protect the Government from staff changes by the grantee which the Surgeon General may not approve. In this case, the selection of Dr. Steenburg as Principal Investigator for an interim period was officially approved by N.I.H., as was the selection of Dr. Krizek by Yale University in its transfer application.

An analysis of Section 241 and the Part 52 regulations therefore convinces this Court that the plaintiff has suffered no personal legal wrong in this case. Dr. Rubinstein has come to this Court to vindicate an alleged personal legal injury. This Court holds that the defendants have not violated any legal rights of the plaintiff.[6]

The complaint is hereby dismissed with costs to be borne by the plaintiff.

6. Due to this Court's resolution of this case, it is unnecessary to decide whether the actions of the Surgeon General and his agents are "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701 and whether judicial review is thereby precluded. In addition, this Court need not determine whether the plaintiff has standing to secure judicial review as a person "adversely affected or aggrieved by agency action within the meaning of a relevant statute" under 5 U.S.C. § 702. In this latter connection, it is noted that the plaintiff has not referred this Court to any such relevant statute.