## JOHN J. WILD, M. D. v. FRANK M. RARIG AND OTHERS.*

234 N. W. 2d 775.

January 10, 1975—No. 44238.

*Appeal dismissed, 424 U. S. 902, 96 S. Ct. 1093, 47 L. ed. 2d 307 (1976).

*Dorsey, Marquart, Windhorst, West & Halladay, Henry Halladay, William P. Luther, Robert L. Hobbins, Altman, Geraghty, Mulally & Weiss,* and *James W. Kenney,* for appellants.

*James Malcolm Williams* and *John Remington Graham,* for respondent.

PER CURIAM.

This is an appeal from a judgment and from an order denying a new trial. We reverse and grant a new trial with directions.

On December 3, 1966, Dr. John J. Wild, a research scientist, commenced a multiple-count action seeking combined damages of $35,000,000 against Amherst H. Wilder Foundation and Minnesota Foundation, both Minnesota nonprofit corporations, and against Frank M. Rarig and Julian Baird. Frank Rarig was executive director and secretary and Julian Baird was president of each respective foundation. In essence, the complaint contended that Dr. Wild was developing ultrasonic techniques to detect cancer in women's breasts and that the defendants were liable for contract and tort damages allegedly resulting from the manner in which Minnesota Foundation, as the grantee institution, withdrew its sponsorship from a cancer research grant awarded by the United States Public Health Service to Minnesota Foundation and Dr. Wild, who was the project's principal investigator.

Specifically, Dr. Wild contended that Minnesota Foundation had breached its contract with him by withdrawing sponsorship; that the defendants were negligent in handling the administration of the grant from the Public Health Service; that defendants unreasonably interfered with the administration of the grant by attacking the scientific and professional standing of Dr. Wild as principal investigator of the project, by attempting to interfere with his laboratory staff, and, finally, by attempting to destroy the cancer project and Dr. Wild's scientific reputation; that in the process the defendants interfered with Dr. Wild's prospective business and professional advantages; that the de-

fendants had defamed Dr. Wild in communications to the Public Health Service, Mount Sinai Hospital, and others; and that punitive damages were called for because of defendants' malicious behavior.

On January 4, 1967, the defendants individually answered the complaint, denying liability and pleading as an affirmative defense to the tort claims the 2-year statute of limitations found in Minn. St. 541.07.

On October 16, 1972, the case came to trial before a jury in Hennepin County District Court. At the close of the case, the parties' motions for directed verdict were denied, but defendant Baird was dismissed from the case.[1] Final arguments and instructions were given on Monday, November 27, 1972. The trial court submitted to the jury four causes of action: (1) Breach of contract, (2) bad-faith termination of contract, (3) interference with contract and professional business relationships, and (4) defamation of plaintiff. The negligence cause of action was not submitted to the jury. The court instructed as a matter of law that Dr. Wild was not an employee of Minnesota Foundation and that both foundations were liable for the acts of their agent, Rarig.

On December 6, 1972, the trial court signed its order for judgment, pursuant to the jury's special verdict, against defendants Rarig, Minnesota Foundation, and Wilder Foundation, in the cumulative amount of $16,277,300, of which $5,452,300 was for compensatory damages and $10,825,000 was for punitive damages.[2] The defendants' motions for judgment notwithstanding

---

[1] The trial was acrimonious and protracted, consisting of 24 trial days, 300 to 400 exhibits, 16 witnesses, 2 depositions, and a transcript which totaled approximately 3,700 pages.

[2] The special verdict form read as follows: "We the jury in the above-entitled action find as follows:

"1.　There was a contract between the defendants and the plaintiff.

"2.　There was a breach of said contract by the defendants.

"3.　We award plaintiff the sum of 129,000 dollars for said breach of

the special verdict and for amended findings or, in the alternative, for a new trial were denied on January 19, 1973. After judgment was entered and filed, defendants appealed to this court. On March 12, 1973, the justices of the supreme court recused themselves because of possible conflicts of interest.[3] Subsequently, a temporary body of nine district judges was appointed to sit on this case.[4]

---

contract.

"4. We find that the contract was terminated by the defendants in bad faith.

"5. We award plaintiff 1,323,300 dollars for said bad faith termination of the contract.

"6. We award the plaintiff 825,000 dollars as punitive damages for said bad faith termination of the contract.

"7. We find that the defendants did interfere with the then existing contract and professional business relationship of plaintiff following termination of the project.

"8. We award the plaintiff 2,000,000 dollars for said interference.

"9. We award the plaintiff 5,000,000 dollars as punitive damages for said interference.

"10. We find that the defendants did defame the plaintiff.

"11. We award the plaintiff 2,000,000 dollars as damages therefor.

"12. We award the plaintiff 5,000,000 dollars as punitive damages for said defamation."

[3] One alleged conflict of interest concerned James C. Otis, Associate Justice of the Minnesota Supreme Court, and his membership on the board of directors of both foundations and his appearance as a witness in this case. Another alleged conflict of interest was that visitorial powers were conferred upon the justices of the supreme court by the various wills of the Amherst H. Wilder family, which allegedly allowed them to have some interest in Amherst H. Wilder Foundation.

[4] The temporary panel of justices was appointed under Minn. St. 2.724, subd. 2, which provides in pertinent part: "* * * Any number of justices may disqualify themselves from hearing and considering a case, in which event the supreme court may assign temporarily a retired justice of the supreme court or a district judge to hear and consider the case in place of each disqualified justice." The supreme court, in a statement, explained that with the exception of the Second Judicial District, in which the Wilder Foundation conducts its principal charitable ac-

Dr. Wild, a native of England and holder of numerous degrees from Cambridge, is licensed to practice medicine in England and in Minnesota, although most of his work has been in research. While in the British Armed Forces during World War II, he became interested in distention and paralysis of the bowel. In September 1946, Dr. Wild came to the University of Minnesota Medical School to continue his work on intestinal distention. Sometime in 1949, Dr. Wild claimed, he ascertained by research that ultrasound echoes or waves could measure the thickness of a bowel wall. From this determination, he began using ultrasound techniques as a clinical aid to cancer detection.

Dr. Wild asserted that from 1950 to July 1960, with the assistance of numerous Public Health Service grants and with the aid of the University of Minnesota Medical School, the Department of Electrical Engineering of the University of Minnesota, and St. Barnabas Hospital as sponsors, he developed an "echograph," a machine with a scanning device that received impulses in much the same way as do radar and sonar pictures, which when properly manipulated translated on a cathode-ray tube (oscilloscope) the presence or absence of cancer in women's breasts. Dr. Wild claimed there is a definite difference between the ultrasonic echo or wave patterns of noncancerous and cancerous tissues. Assuming that early detection is the principal hope to cure cancer, his objective in using "echography" was to discover cancer without the use of surgical procedures and proposed an eventual plan to mass-produce the "echograph" and scan people for cancer throughout the world.

Dr. Wild's relationship with his three previous sponsors had been somewhat controversial and when it became apparent that St. Barnabas Hospital would no longer sponsor his work, Dr. Wild appealed to the Hill Family Foundation of St. Paul, Minnesota, who referred him to Frank Rarig, executive director and

---

tivities, the chief judge (annually elected in each district by the judges of such district), or, if unable to serve, the senior judge in point of service, of each of the 10 judicial districts was selected.

secretary of Minnesota Foundation and the Wilder Foundation.[5]

At a July 1960 meeting with Rarig, Dr. Wild explained that his objectives were to obtain a new sponsor for his interdisciplinary cancer research project in order to obtain Public Health Service funds and for someone to take responsibility for laboratory equipment then owned by governmental agencies. At this time, he also asserted that he had had difficulty in maintaining his authority under his prior grants with respect to noninterference by sponsors.[6] Later, Rarig, on behalf of Minnesota Foundation, and Dr. Wild signed two grant applications, which were subsequently rejected, asking the Public Health Service for a one-year cancer-research grant.

Sometime in the fall of 1960, an advisory committee, consisting of men professionally competent to judge or pass on the objective and methodology of the interdisciplinary research project, was appointed at the request of Minnesota Foundation, for which committee Dr. Wild had suggested various members. Sidney Colbert, a hardware executive, was selected as president of the committee. Later, Minnesota Foundation assumed responsibility

---

[5] The Wilder Foundation was organized as a nonprofit corporation with substantial assets in 1910 as the result of a merger of three corporations which were formed in the early 1900's by the wills of the Amherst H. Wilder family. In 1949, to overcome legal limitations imposed by the Wilder wills, the members of the board of directors of the Wilder Foundation incorporated Minnesota Foundation as a nonprofit corporation and became its first board of trustees. Prior to this, the articles of incorporation of the Wilder Foundation were amended, with court approval, to authorize it to arrange for the use of its services and facilities, including its administrative staff and other personnel, by any other nonprofit and charitable corporation. Pursuant to these legal arrangements, Minnesota Foundation had a contract with the Wilder Foundation for executive, management, and research services. Minnesota Foundation reimbursed the Wilder Foundation for all services received, since Wilder Foundation funds could not be used to finance or subsidize Minnesota Foundation.

[6] It is undisputed that Dr. Wild conversed only with Rarig and did not meet any member of the Board of Trustees of Minnesota Foundation.

from St. Barnabas Hospital for the laboratory equipment and collected $1,500 in contributions.

Dr. Wild testified as to the following: That in 1960 and 1961, he had a number of conversations with Rarig about extending the length of the application to at least 5 or even 7 years; that he had reiterated to Rarig at these meetings that Minnesota Foundation would be responsible for the indirect costs of the project (the administrative and accounting expenses) and the fiscal accounting of the direct costs of the project (the scientific expenses) but that he would have complete freedom of determining the costs of research, equipment, and the payment of the staff; that he would take care of working hours, management, hiring, and firing of personnel; that he would have complete scientific command of the project; and that the advisory committee would represent Minnesota Foundation on the scientific conduct of the project. On November 2, 1960, and January 30, 1961, Rarig, on behalf of Minnesota Foundation, and Dr. Wild signed applications, which were subsequently rejected, requesting 5 years of funds from the Public Health Service.

Dr. Wild contends that his conversations with Rarig and the applications submitted to the Public Health Service created an oral sponsorship contract from which Minnesota Foundation could not withdraw sponsorship if the government granted financial aid.[7]

On January 4, 1962, Minnesota Foundation and Dr. Wild applied for a grant of $123,000 from the Public Health Service for a "Medico-Technological Research Unit" to investigate, among other things, ultrasonic techniques for detection and diagnosis of tissue abnormalities. This application, jointly prepared and executed by Dr. Wild and Rarig, on behalf of Minnesota Foundation, named Minnesota Foundation as grantee institution and Dr. Wild as principal investigator. It requested funds from

---

[7] All the grant applications, except the one ultimately accepted by the Public Health Service, were not offered or received in evidence. In light of Dr. Wild's contentions, they may be material to the issues.

February 1, 1962, to September 30, 1962, in addition to 6 years of support which could be obtained by renewal applications.

On July 23, 1962, Grant GM 10063-01 (the grant) was issued by the Public Health Service to Minnesota Foundation as the grantee institution and Dr. Wild as principal investigator. The notification and statement of grant award stated that the initial grant was for $147,205 for the period August 1, 1962, to July 31, 1963, and provided future support, if funds were appropriated, for 3 additional years. Minnesota Foundation was to handle the grant money and receive 10 percent, or $14,000, as indirect costs for administering the grant. The notification referred the reader for further information on specific details applicable to general policies on research grants to a booklet entitled "Grant and Award Programs of the Public Health Service, Volume I—Policy and Information Statement on Research Grants—1959." This manual was subsequently supplemented by a pamphlet entitled "Supplement to Policy and Information Statement on Research Grants (Volume I) Pertaining to Research Program-Project Grants and Research Center Grants."

A few days after the project officially began, August 1, 1962, Dr. Wild hired two people for the project staff. Rarig wrote a letter admonishing Dr. Wild for not having sought prior approval of the advisory committee or Minnesota Foundation. This early incident probably best illustrates the basic conflict which was to plague the research endeavor throughout its existence—whether Dr. Wild or Minnesota Foundation was in control of the project. The situation gradually deteriorated in the early spring of 1963 into frequent confrontations between Dr. Wild and Minnesota Foundation, represented by Rarig, over salaries of the staff, hiring and firing of personnel, purchases of equipment, working hours, vacation time, accounting procedures, expense accounts, staff dissension, and the advisory committee's role and Rarig's function on the project.

Sometime in May 1963, a renewal application (GM 10063-02)

was submitted to the Public Health Service.[8] However, on May 27, 1963, the advisory committee issued a statement endorsing Dr. Wild's performance in regard to the research project even though it had heard staff members of the project complain of Dr. Wild's allegedly less than efficient performance as a personnel and business administrator. In June, Sidney Colbert, chairman of the advisory committee, requested Rarig to leave and not attend future advisory committee meetings. Rarig, after continued visits with staff personnel, requested a meeting with the Public Health Service to discuss the situation. At a July 17, 1963, meeting, Rarig gave Dr. Carl Brewer and Dr. Trygve Tuve, officials of the Public Health Service, a memorandum entitled "Evaluation of Dr. Wild's Direction and Management of Minnesota Foundation's Medico-Technological Research Unit," which stated that Dr. Wild (1) was incompetent as an administrator; (2) had falsely certified payrolls; (3) had used improper purchasing procedures; (4) had his staff concealing facts and covering up for him; and (5) that for Minnesota Foundation to continue to sponsor Dr. Wild, the indirect costs must be increased to 20 percent so it could employ a full-time administrator to oversee the laboratory.[9]

When the Public Health Service delayed in acting on Rarig's request, Minnesota Foundation on July 31 informed it that sponsorship of Dr. Wild's cancer-research project would be terminated on September 15, 1963.[10] Later, Minnesota Foundation

---

[8] This renewal application was not offered or received in evidence. In light of the contentions of the parties, it may be material to the issues.

[9] This memorandum was returned by the Public Health Service and was destroyed by Rarig at the request of Minnesota Foundation. Defendants contend that Dr. Wild had knowledge of the existence of this memorandum from a blind copy letter dated August 9, 1963, the original sent from the Public Health Service to Rarig. After a series of circuitous events, Dr. Wild received a copy of the memorandum on April 24, 1968.

[10] Rarig gave the following reasons for Minnesota Foundation's termination: "A. He [Dr. Wild] did not recognize that ultimate control was

acquiesced to an advisory committee request to continue the project until December 31, 1963, in order to allow Dr. Wild time to find a new sponsor.

During the remainder of 1963, many efforts were made by Dr. Wild and by some advisory committee members to obtain another sponsor for the project. In particular, Dr. Wild contacted the Research and Education Committee of Mount Sinai Hospital in Minneapolis, Minnesota. In response to a call from Mount Sinai, Rarig, in early November, appeared before the committee. The committee members present at that meeting included Dr. Francisco Grande, who was director of Jay Phillips Research Laboratory at Mount Sinai Hospital, and Dr. Alvin Schultz, the director of medicine and medical research at Mount Sinai Hospital, who testified that Rarig suggested that Mount Sinai take over the project. On December 9, a research meeting was held with Dr. Wild and Sidney Colbert. The same committee members were present as at the November meeting except for the addition of Hyman Edelman, cochairman of the committee and later one of defendants' attorneys (withdrawing from that position when it became apparent he might be a witness). Dr. Wild stated he would not accept Mount Sinai's sponsorship unless he had complete control of the project, which Mount Sinai would not give since it took an active role in the administration of its grants. Mount Sinai subsequently disapproved sponsorship of Dr. Wild's project.

In the latter part of 1963, Rarig engaged in a phone conversa-

vested in Minnesota Foundation as the grantee and sponsor. His concept apparently was that Minnesota Foundation was a bookkeeper to carry out his instructions.

"B. He was unable to maintain constructive relationships with the project employees. There were continuing and repeated instances of differences between him and the other employees leading to hostile attitudes and chaos.

"C. He was not responsible in accounting for his own time.

"And, D. His conduct of the project was not satisfactory to Minnesota Foundation."

tion with Dr. Tuve and John Haje, both officials of the Public Health Service, on disposal of the project's laboratory equipment. After speaking with Rarig, these officials wrote a memorandum to the record of their conversations in which they stated that Rarig expressed a fear that Dr. Wild would either destroy or dispose of the laboratory equipment because "equipment used by Dr. Wild had been known to disappear at other places where Dr. Wild had worked." Rarig denied making this statement.

On December 29, 1963, Dr. Wild alleged he had made a scientific breakthrough in his cancer project—an electronic meter which would instantaneously register the difference between normal and abnormal tissues and thus make unnecessary hand calculations which until then had been required and could take hours. On December 31, 1963, the day the project ended, Dr. Wild gave a demonstration of his breakthrough and issued a prepared press release to the media. After a phone conversation with Rarig, Dr. Tuve of the Public Health Service wrote a memorandum to the record which quoted Rarig as stating that various people had concluded that Dr. Wild's breakthrough was "faked." Rarig also denied making this statement. Dr. Wild has indicated he did not receive a copy of this document or of the memorandum prepared by Dr. Tuve and Mr. Haje until shortly before this trial.

The laboratory doors were locked on December 31, 1963, and no one had access except on Rarig's authorization. By January 31, 1964, after an audit and inventory, the bulk of the laboratory equipment had been sent to the Public Health Service at Bethesda, Maryland.

After the project's termination, Dr. Wild worked as a hardware clerk and retrained himself as a treating physician. The record also indicates that Dr. Wild made many attempts to find a new sponsor for his project but with no results.

## PREJUDICIAL MISCONDUCT

Defendants contend that Dr. Wild and his counsel were guilty of prejudicial misconduct, while Dr. Wild claims that defendants' counsel attempted to "bait" his counsel into misconduct, that few

objections were made to his counsel's behavior, and that there were few requests for curative instructions by either counsel.

The matter of granting a new trial for misconduct of counsel or prevailing party is governed by no fixed rules but rests almost wholly in the discretion of the trial court and its action will not be reversed on appeal except for a clear abuse of discretion. Brecht v. Town of Bergen, 182 Minn. 603, 235 N. W. 528 (1931). If the trial court instructed the jury to disregard the improper remarks or arguments, a new trial will rarely be ganted by this court. See, Hinman v. Gould, 205 Minn. 377, 286 N. W. 364 (1939). The primary consideration in determining whether to grant a new trial is prejudice. Boland v. Morrill, 270 Minn. 86, 132 N. W. 2d 711 (1965). The general rules are well set out in Patton v. Minneapolis St. Ry. Co. 247 Minn. 368, 375, 77 N. W. 2d 433, 438, 58 A. L. R. 2d 921, 929 (1956), where this court stated:

"*Unless the misconduct is so flagrant as to require the trial court to act on its own motion* [See, Magistad v. Potter, 277 Minn. 570, 36 N. W. 2d 400 (1949) ; Janicke v. Hilltop Farm Feed Co. 235 Minn. 135, 50 N. W. 2d 84 (1951)], which is rarely the situation and is not the case here, in order to raise the claim of misconduct there must be an objection at the time of the alleged misconduct, or at the close of the argument when it has been taken down by the reporter, and before the jury retires; also a request for corrective action and the failure of the court to act. A party is not permitted to remain silent, gamble on the outcome, and, having lost, then for the first time claim misconduct in opposing counsel's argument." (Italics supplied.)

This court has kept in mind that some prejudicial statements were not objected to and that the trial court sustained the objections made to some of the others and, in some instances, gave a cautionary instruction to the jury. Nevertheless, a close scrutiny of the record leaves us with a firm conviction that the trial court should have acted on its own motion and granted a new trial and

therefore erred in denying defendants a new trial. There is no need to chronicle the prejudicial misconduct of plaintiff and the prejudicial misconduct of counsel for both parties. The trial record is permeated by such personality conflicts, such obvious appeals to passion and prejudice, and such rude, abusive, and unlawyerlike trial antics and tactics that no jury could arrive at an impartial verdict. It is this court's responsibility to grant a new trial where misconduct, whether of party or of counsel, viewed in light of the whole record, appears to be inexcusable and of such serious and prejudicial consequence as to deny the litigants a fair trial. Since the prejudicial misconduct cannot be isolated, a new trial is granted.

After a new trial is granted by this court, we normally will not discuss other contentions raised by the parties. However, in light of the fact that the trial court may again be called upon to rule and in view of the fact that much of the law on the disputed questions is unclear, we will review a number of the issues on the supposition that by so doing another appeal might be avoided. Rule 103.04, Rules of Civil Appellate Procedure;[11] Lindstrom v. Yellow Taxi Co. 298 Minn. 224, 214 N. W. 2d 672 (1974).

## CONTRACT

Dr. Wild's contract contentions are ambiguous. He makes reference to both the alleged oral sponsorship contract and to the Public Health Service contract for his obligations and rights. Defendants claim their obligations and rights with respect to Dr. Wild and the Public Health Service are defined in the Public Health Service manuals. These contentions, coupled with the fact that we cannot discern upon which alleged contractual breach the jury awarded damages, make various trial court rulings ex-

---

[11] Rule 103.04(2), Rules of Civil Appellate Procedure, provides: "On appeal from an order the Supreme Court may review any order affecting the order from which the appeal is taken and on appeal from a judgment may review any order involving the merits or affecting the judgment. It may review any other matter as the interests of justice may require."

tremely important. In order to provide proper guidance for the trial court on a new trial, we must consider these determinations.

The first ruling of the trial court to be considered is whether a witness may give his opinion as to whether there was breach of contract. Dr. Wild, over numerous, strenuous objections,[12] and Frank Rarig, without objection, gave their opinions on what they concluded were alleged breaches of contract.

Defendants argue here that admission of Dr. Wild's opinion testimony on whether there was a breach of contract was error. Dr. Wild argues that his opinions on whether there was a breach of contract were properly received by the trial court because (1) the contract involved highly technical matters; (2) many of his opinions were received without objection; (3) Rarig, without objection, rendered his opinion on the contract breach; and (4) the jury clearly understood they were the triers of the facts in the case.

Although this court's attitude has been liberal in regard to opinions of a witness (Jones v. Burgess, 124 Minn. 265, 144 N. W. 954 [1914]; Licensed Retail Liquor Dealers Assn. v. Denton, 144 Minn. 81, 174 N. W. 526 [1919]), it was error in this case to permit witnesses to give their conclusions or their opinions as to what constitutes a breach of contract. Cf., Roehl v. Baasen, 8 Minn. 9 (26) (1862); Cargill v. Thompson, 57 Minn.

---

[12] Dr. Wild gave his opinion on breach of contract some 40 times, often over objection. Many of these opinions were cumulative and repetitive. The following is a typical example:

"Q. And at any rate, Doctor, did Mr. Rarig acting on behalf of the Defendant institutions at sometime during the course of the project insert himself as secretary of the Advisory Committee?

"A. Yes.

"Q. And based on your agreement with Mr. Rarig acting for and on behalf of the Defendant institutions, was this a breach of the contract you entered into with the Defendant institutions?

"MR. HALLADAY: Objected to as calling for an opinion on legal matters.

"THE COURT: He may answer the question.

"A. Yes."

534, 59 N. W. 638 (1894); Peerless Machine Co. v. Gates, 61 Minn. 124, 63 N. W. 260 (1895); Phillips v. Menomonie Hydraulic-Press Brick Co. 109 Minn. 55, 122 N. W. 874 (1909); Kinshella v. Small, 137 Minn. 406, 163 N. W. 744 (1917). See, also, McCormick, Evidence (2 ed.) §§ 11, 12. The admission of these opinions, on an ultimate fact issue, would merely tell the jury what result to reach. There is a real and substantial danger that the jury will not examine the facts but accept the opinion evidence only. In Lewin v. Proehl, 211 Minn. 256, 258, 300 N. W. 814, 816 (1941), this court in discussing a similar problem stated:

"By assignment of error defendant objects strenuously to rulings admitting the conclusions of plaintiff as to the meaning of the conversation. Plaintiff did testify that he and defendant 'agreed' thus and so. That was objectionable because it stated plaintiff's conclusion or inference rather than the conversational facts upon which it was based."

This is not such a complex case that the jury could not determine from the witnesses' testimony of the facts whether a contract was formed and, if formed, whether that contract was breached. The resolution of these fact issues was the province of the jury.

The second ruling of the trial court which must be considered concerns the admission into evidence and then the exclusion from evidence of the 1963 Public Health Service Grants Manual (defendants' exhibit 50). The trial court excluded the exhibit because "it has no application to the conduct of the parties at the time the contract was entered into and in effect attempts to change the terms of the original contract."

When Dr. Wild and Mr. Rarig submitted their January 4, 1962, application for a research award, they specifically agreed to the following: "Funds granted as a result of this request are to be expended for research or related purposes as governed by Public Health Service and grantee institution policies."

On July 23, 1962, the Public Health Service sent a "NOTIFICA-TION AND STATEMENT OF GRANT AWARD," setting forth the Public Health Service's policy requirements for the awards. On the reverse side of the notification is an "EXPLANATION OF STATE-MENT OF RESEARCH GRANT—Revised July 1, 1961," which provides:

"I. PUBLIC HEALTH SERVICE POLICY REQUIREMENTS:* The grantee institution is obligated to administer any Public Health Service grant or award in accordance with the policies governing the Grant and Award Programs of the Public Health Service."

A footnote to the Explanation states:

"* REFERENCE: For further information on specific details applicable to general policies on Research Grants, see 'Grant and Award Programs of the Public Health Service, Volume I—Policy and Information Statement on Research Grants—1959.' "

The Grants Manual excluded from evidence appears to have become effective January 1, 1963, and, if received, would have expressly provided for termination or withdrawal of sponsorship by the grantee institution.[13]

Defendants argue that the exclusion from evidence of the 1963 Grants Manual took a fact issue from the jury's determination. They contend that the trial court erred when it ruled that a contract was in existence and that the exhibit would change the terms of that contract. Dr. Wild claims that the 1963 Grants Manual is irrelevant since it was promulgated after the alleged oral sponsorship contract was formed; that the manual could not modify the terms of the oral sponsorship contract since modification was not pleaded as an affirmative defense and the

---

[13] Section 515 D of the 1963 Grants Manual provides in pertinent part as follows:

"D. *Termination Procedure*

"Research grants may be terminated at any time by the grantee institution upon written notification from an authorized institution official to the sponsoring Institute or Division of the Public Health Service."

438

matter was not tried by consent; and that the manual only relates to the alleged Public Health Service contract.

Based upon this record, it was error not to allow the 1963 Grants Manual to be admitted into evidence since it apparently became effective on January 1, 1963, which could make it operative for a major part of this research project, and Minnesota Foundation, the Public Health Service, and Dr. Wild relied on this manual at one time or another. See, also, Rubinstein v. Mayor & City Council of Baltimore, 295 F. Supp. 108 (D. Md. 1969).

Another ruling of the trial court concerned a jury instruction which stated Dr. Wild was not an employee of Minnesota Foundation.

Defendants argue that Dr. Wild's relationship with Minnesota Foundation was that of an employee, terminable at will, and that when the trial court ruled as a matter of law that he was not an employee, it took a fact issue from the jury. Dr. Wild asserts that he was an independent contractor and not an employee of Minnesota Foundation but claims that his status as such became meaningless when the trial court subsequently gave the following instruction reading in pertinent part:

"* * * If you find one of the terms to be that the contract had no definite duration, that is, it was to come to an end on no particular set day, then it was terminable at will, and the defendants had a right to terminate the contract upon giving reasonable notice." [14]

Dr. Wild claims that this instruction was substantially what the defendants desired.

We do not agree with Dr. Wild's contention that the trial court gave the equivalent of an employee-independent contractor instruction. The trial court's instructions did not prescribe the

[14] See, Skagerberg v. Blandin Paper Co. 197 Minn. 291, 266 N. W. 872 (1936); Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 117 N. W. 2d 213 (1962).

necessary elements or factors to be considered by the jury in determining if this was an agency or an independent contractor relationship. The tests applicable to making this determination are adequately stated in previous decisions of this court. Castner v. Christgau, 222 Minn. 61, 24 N. W. 2d 228 (1946); Willner v. Wallinder Sash & Door Co. 224 Minn. 361, 28 N. W. 2d 682 (1947); Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. 2d 785 (1949); Nicholas v. Hennepin Wheel Goods Co. 239 Minn. 269, 58 N. W. 2d 572 (1953); Lindbery v. J. A. Danens & Son, Inc. 266 Minn. 420, 123 N. W. 2d 695 (1963); Boland v. Morrill, 270 Minn. 86, 132 N. W. 2d 711 (1965); Restatement, Agency (2d) §§ 2 and 220; 11B Dunnell, Dig. (3 ed.) § 5835. However, we agree that as a general rule, unless the evidence is conclusive, the determination of whether a person is an independent contractor is a jury question. 11B Dunnell, Dig. (3 ed.) § 5835(5). The evidence in this case indicates to us that whether Dr. Wild's status was that of an employee or that of an independent contractor was a fact issue for the jury and it was error for the trial court to have ruled as a matter of law.[15]

## BAD-FAITH TERMINATION OF CONTRACT

The trial court stated in its instructions that one of Dr. Wild's claims against the defendants consisted of bad-faith termination

---

[15] Another problem is that judgment was jointly entered for all claims against Minnesota Foundation, the Wilder Foundation, and Mr. Rarig. In Seavey, Agency, § 123, p. 211, the following is found: "Except in the case of a negotiable instrument, an agent is not a party to a contract made by him for his principal, unless he gives his personal promise to perform." The burden of proof is upon the one who seeks to hold the agent as a party and there is an inference that the agent is not a party to a contract made for a disclosed principal. Seavey, Agency, § 70(D), § 123. An agent's personal liability for torts committed by himself is, of course, a different matter. Seavey, Agency, § 129. A larger issue is the joint liability of both foundations. The trial court ruled as a matter of law that they were one and the same. See, Henn, Law of Corporations, § 148. We express no view on this matter or on Rarig's personal liability for the contract.

of contract. The jury awarded $2,148,300 in compensatory and punitive damages on this claim.

Defendants contend that there is no tort action for bad-faith termination of contract independent of or in addition to damages for conventional breach of contract.

Dr. Wild contends that bad-faith termination of contract was submitted to the jury as a part of the "interference with then present contract and professional business advantages and relationships" tort claims. He argues that the trial court combined interference with contract and professional business relationships and bad-faith termination of contract as intentional torts separate and apart from breach of contract for the period from August 1, 1963 (termination of contract), up to the time of termination of the project on January 31, 1964 (submitted to the jury as questions Nos. 4, 5, and 6 of the special verdict), and combined such interference and bad-faith termination following the termination of the project into interference following termination of the project (submitted in questions Nos. 7, 8, and 9).

A reading of the special verdict and the instructions convinces us that bad-faith termination of contract was submitted to the jury as a separate and distinct tort claim for which a separate recovery was awarded and that it was not a part of the "interference" claims found in questions Nos. 7, 8, and 9.

We are of the opinion that when a plaintiff seeks to recover damages for an alleged breach of contract he is limited to damages flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort. Whittaker v. Collins, 34 Minn. 299, 25 N. W. 632 (1885); Beaulieu v. G. N. Ry. Co. 103 Minn. 47, 114 N. W. 353 (1907); City of East Grand Forks v. Steele, 121 Minn. 296, 141 N. W. 181 (1913); Calamari & Perillo, The Law of Contracts, § 204; Simpson, Law of Contracts (2 ed.) § 195, p. 394. An excellent example of this is found in wilful and unlawful injuries to passengers upon railroad trains. There is in such cases a contract by the railroad company to safely carry

the passenger to his destination and an implied legal duty to protect him while the relationship of passenger and carrier exists, and the courts declare that a breach of that duty constitutes an independent tort, for which recovery may be had for the injury to which the passenger is subjected. In such cases the duty is an incident of the relationship rather than the contract, and the carrier would be liable if the passenger was carried free. Mykleby v. Chicago, St. P., M. & O. Ry. Co. 39 Minn. 54, 38 N. W. 763 (1888). For other examples, see, Prosser, Torts (4 ed.) § 92. We hold that this is not the exceptional case where the breach of contract amounts to an independent tort. The foundation of Dr. Wild's action was the contract, and the gravamen of it, its breach. Whittaker v. Collins, *supra*. The duty imposed on Minnesota Foundation was a contractual one.

Dr. Wild, however, contends that an implied covenant of good faith is found in this contract and that a bad-faith or malicious breach of that covenant provides a tort remedy.

Some courts have held that there is an implied condition of good faith in all contracts, whether sales contracts or not. 17 Am. Jur. 2d, Contracts, § 256; 17A C. J. S., Contracts, § 328. Minnesota statutory law, in the Uniform Commercial Code, provides for an implied condition of good faith in sales contracts. Minn. St. 336.1—201(19), 336.1—203, 336.2—103(1) (b). This court has read an implied condition of good faith into a nonsales contract containing reciprocal duties and obligations on the part of the contracting parties where one of the parties made it impossible for the other to perform. Haase v. Stokely-Van Camp, Inc. 257 Minn. 7, 99 N. W. 2d 898, 87 A. L. R. 2d 726 (1959). Whether this court will read such a condition of good faith into all contracts has not yet been decided.

Assuming for the sake of argument that an implied covenant of good faith was maliciously broken in this contract, that malicious motive may be important in determining whether a material breach has occurred, but it is immaterial in so far as damages for contract breach are concerned. In Independent

Grocery Co. v. The Sun Ins. Co. 146 Minn. 214, 217, 178 N. W. 582, 583 (1920), this court stated:

"The motives prompting the breach of a contract are immaterial, so far as the rule of damages is concerned, and, however malicious or wrongful, the measure of compensation remains the same. North v. Johnson, 58 Minn. 242, 59 N. W. 1012; 1 Sutherland, Dam. § 99. That is settled law, with few exceptions referred to in Beaulieu v. Great Northern Ry. Co. 103 Minn. 47, 114 N. W. 353, 19 L. R. A. (N.S.) 564, 14 Ann. Cas. 462, * * *."

See, also, 5B Dunnell, Dig. (3 ed.) § 2559. A malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action. Accordingly, we think that bad-faith termination of contract is not an independent tort of the kind that will permit a tort recovery.

### STATUTE OF LIMITATIONS

The threshold issue is whether wrongful interference with business relationships by means of defamation is included in Minn. St. 541.07, the 2-year statute of limitations, or Minn. St. 541.05, the 6-year statute of limitations.[16]

---

[16] The jury returned a verdict of $2,000,000 compensatory damages and $5,000,000 punitive damages for interference with contract and professional business relationships. Wrongful interference with contract and wrongful interference with business relationships, also known as interference with contractual relations and interference with prospective advantage, Prosser, Torts (4 ed.) §§ 129, 130, are actionable tort claims in Minnesota. Witte Transp. Co. v. Murphy Motor Freight Lines, Inc. 291 Minn. 461, 193 N. W. 2d 148 (1971); Snowden v. Sorensen, 246 Minn. 526, 75 N. W. 2d 795 (1956); Sorenson v. Chevrolet Motor Co. 171 Minn. 260, 214 N. W. 754, 84 A. L. R. 35 (1927); Carnes v. St. Paul Union Stockyards Co. 164 Minn. 457, 205 N. W. 630, 206 N. W. 396 (1925); Tuttle v. Buck, 107 Minn. 145, 119 N. W. 946 (1909). See, also, American Surety Co. v. Schottenbauer, 257 F. 2d 6 (8 Cir. 1958). See, generally, 86 C. J. S., Torts, §§ 40, 44, 54 to 59; 45 Am. Jur. 2d, Interference; 19A Dunnell, Dig. (3 ed.) § 9637; 1 Harper & James, The Law of Torts, §§ 6.5 to 6.13. Wrongful interference with contract protects an interest in the security of contractual relationships, Prosser, Torts (4 ed.) § 129; 1 Harper &

Defendants claim that wrongful interference with business relationships may be construed as being included in and barred by the 2-year statute of limitations because it is similar to the other intentional torts enumerated in Minn. St. 541.07. In effect, defendants argue that the claimed interference with business relationships is simply another label for defamation, since the means allegedly used to interfere was defamation, and therefore is included in the 2-year statute of limitations. Dr. Wild claims that wrongful interference with business relationships is not barred by the 2-year statute of limitations because it is a property tort and therefore is included in the 6-year statute of limitations.

Minn. St. 541.07, in pertinent part, reads:

"Except where the uniform commercial code otherwise prescribes, the following actions shall be commenced within two years:

"(1) For libel, slander, assault, battery, false imprisonment, or other tort, resulting in personal injury, and all actions against physicians, * * * for malpractice, * * * whether based on contract or tort; * * *."

The phrase, "or other tort resulting in personal injury," was added by L. 1895, c. 30, and has remained unchanged since that time.

The first case to construe the amended provision was Brown

---

James, The Law of Torts, § 6.5, and wrongful interference with business relationships protects an interest in the reasonable expectation of economic advantage. 45 Am. Jur. 2d, Interference, § 50. However, under the facts of this case, Dr. Wild does not have a cause of action for wrongful interference with contract since that action does not permit one party to sue another party to the same contract for breaches inter se. Cuker Industries, Inc. v. William L. Crow Constr. Co. 6 App. Div. 2d 415, 178 N. Y. S. 2d 777 (1958); Glazer v. Chandler, 414 Pa. 304, 200 A. 2d 416 (1964); 45 Am. Jur. 2d, Interference, § 26; Prosser, Torts (4 ed.) § 129, p. 934, footnote 9. Dr. Wild alleges two contracts, but in each of the alleged contracts he and Minnesota Foundation are contracting parties.

v. Village of Heron Lake, 67 Minn. 146, 69 N. W. 710 (1897). This court construed the amended provision, with the aid of the doctrine of ejusdem generis, as not applying to actions for personal injuries arising from negligent omission to do an act.

Later, in 1897, this court considered the amendment in the case of Bryant v. American Surety Co. 69 Minn. 30, 71 N. W. 826 (1897), and held that an action for malicious prosecution for a crime was included. This court stated that the amended provision must be construed as reading as follows: "An action for libel, slander, assault, battery, false imprisonment, or other like tort resulting in personal injury as do the actions named." 69 Minn. 32, 71 N. W. 826. "Personal injury" was not construed as "bodily injury" but was construed in an exact legal sense as the equivalent of a "personal wrong." This court indicated that a "personal wrong" died with the person as found in the then G. S. 1894, § 5912, which is now Minn. St. 573.01, dealing with survival of causes.[17]

In Ackerman v. Chicago, St. P., M. & O. Ry. Co. 70 Minn. 35, 72 N. W. 1134 (1897), and in Ott v. G. N. Ry. Co. 70 Minn. 50, 72 N. W. 833 (1897), this court heard further arguments on what the 1895 amendment was intended to do and reaffirmed Brown v. Village of Heron Lake, *supra*. This court reiterated that an action for negligent personal injury was within the 6-year statute of limitations. Rejecting the argument that a negligently inflicted injury was a battery and therefore was covered by the 2-year statute, we held that battery as used therein included "an

---

[17] Minn. St. 573.01 reads as follows: "A cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02 [action for wrongful death]. It also dies with the person against whom it exists, except a cause of action arising out of bodily injuries or death caused by the negligence of a decedent or based upon strict liability, statutory liability or breach of warranty of a decedent, survives against his personal representatives. All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former and against those of the latter."

intentionally administered injury to the person—such an injury as could be made the basis of a criminal prosecution, and not that which resulted from the want of due care." Ott v. G. N. Ry. Co. 70 Minn. 50, 54, 72 N. W. 833, 834 (1897).

In Virtue v. Creamery Package Mfg. Co. 123 Minn. 17, 142 N. W. 930, 1136 (1913), an action for malicious prosecution of a civil suit was held to be within the 6-year statute of limitations. This court stated:

"* * * It has been held that the action for malicious prosecution of a criminal charge is within this class [2-year limitation]. Bryant v. American Surety Co. 69 Minn. 30, 71 N. W. 826.

"At first blush it might seem that malicious prosecution of a civil suit should be within the same class, but clearly it is not. The Bryant case was decided on the ground that the malicious prosecution of a criminal action is a personal wrong of the class that dies with the person, and is accordingly of the same class as libel, slander, and false imprisonment. The malicious prosecution of a civil action, on the other hand, is in no sense an injury to the person. We regard this as settled by the decision of this court in Hansen Mercantile Co. v. Wyman, Partridge & Co. 105 Minn. 491, 117 N. W. 926, 21 L. R. A. (N.S.) 727. In that case it was held that an action for maliciously procuring and levying an attachment was an action for an injury not to the person, but to property; that a cause of action for injuries resulting from the attachment, consisting of the destruction of the business and of the credit, reputation and standing of the defendant, and the driving away of customers, was not a personal tort, but a property tort, and that it was assignable. True, there was in that case a seizure of property, but that does not change the principle. * * * In either case, the injury is one to business and property and not to the person. It follows that the claim for malicious prosecution was not barred." 123 Minn. 37, 142 N. W. 938.[18]

---

[18] Other cases construing the 2-year and 6-year statutes of limitations are the following: In Langer v. Newmann, 100 Minn. 27, 110 N. W. 68 (1907), this court treated an action seeking damages for preferring a

Assault, battery, and false imprisonment are intentional torts. Libel and slander are in the nature of strict liability torts as long as the defamer intends to publish his statement to a third person. At common law, the above torts did not survive the death of either party. Prosser, Torts (4 ed.) § 126. It would appear that the same is true under Minn. St. 573.01, the survival statute.[19] Bryant v. American Surety Co. *supra.* See, also, 1 Hanson, Libel and Related Torts, § 206. The above torts may also be the basis of a criminal prosecution.

At common law, there was a split over whether interference with business relations survived. Pro: Sullivan v. Associated Billposters and Distributors, 6 F. 2d 1000, 42 A. L. R. 503 (2 Cir. 1925); Bethlehem Fabricators, Inc. v. H. D. Watts Co. 286 Mass. 556, 190 N. E. 828, 93 A. L. R. 1124 (1934). Contra: Caillouet v. American Sugar Refining Co. 250 F. 639 (E.D. La. 1917); Jones v. Matson, 4 Wash. 2d 659, 104 P. 2d 591 (1940). The better reasoned cases appear to be the former, which hold the tort claim survivable and assignable because it resembles a property or a contract claim. Similarly, wrongful interference with business relationships is not usually the basis of a criminal prosecution. Accordingly, we think that wrongful interference with busi-

---

false charge of insanity against a person as one for a tort resulting in personal injury and consequently included in the 2-year statute of limitations. In the case of Preston v. Cloquet Tie & Post Co. 114 Minn. 398, 131 N. W. 474 (1911), this court held that a conversion action was included in the 6-year statute of limitations. In the case of Quackenbush v. Village of Slayton, 120 Minn. 373, 139 N. W. 716 (1913), this court reaffirmed Brown v. Village of Heron Lake, 67 Minn. 146, 69 N. W. 710 (1897); Ackerman v. Chicago, St. P., M. & O. Ry. Co. 70 Minn. 35, 72 N. W. 1134 (1897); and Ott v. G. N. Ry. Co. 70 Minn. 50, 72 N. W. 833 (1897), and stated that negligent personal injuries were not included in the 2-year statute of limitations. In the case of Villaume v. Wilkinson, 209 Minn. 330, 296 N. W. 176 (1941), this court held that the complaint stated a cause of action for negligence and was therefore governed by the 6-year statute. See, also, 11A Dunnell, Dig. (3 ed.) § 5655.

[19] See, note 16, *supra.*

ness relationships is generally included in Minn. St. 541.05, the 6-year statute of limitations.

However, under the facts of this case, we hold that Dr. Wild's claim of wrongful interference with business relationships by means of defamation is essentially a part of his cause of action for defamation and consequently comes within Minn. St. 541.07, the 2-year statute of limitations. The defamation which is the means used to interfere with his business relationships action is the same defamation that Dr. Wild seeks to recover damages for under his defamation claim. It seems to us that, regardless of what the suit is labeled, the thing done to cause any damage to Dr. Wild eventually stems from and grew out of the defamation. Business interests may be impaired by false statements about the plaintiff which, because they adversely affect his reputation in the community, induce third persons not to enter into business relationships with him. We feel this phase of the matter has crystallized into the law of defamation and is governed by the special rules which have developed in that field. Defamation provides a much broader scope of recovery than wrongful interference with business relationships. Under present defamation law, a victim of defamation may recover, under proper circumstances, general damages; special damages, including among others, loss of business relationships; and possibly punitive damages. See, 1 Hanson, Libel and Related Torts, § 162; 1 Seelman, The Law of Libel and Slander in the State of New York, §§ 371, 374, 382; 1 Harper & James, The Law of Torts, § 5.30; Prosser, Torts (4 ed.) § 112; 11A Dunnell, Dig. (3 ed.) §§ 5508, 5550, 5562a; 53 C. J. S., Libel and Slander, §§ 238 to 245, 260, 263 to 266.

Another issue dealing with Minn. St. 541.07 on which Minnesota has no statutory law or case law is: When does a cause of action for defamation accrue in order to commence the running of the statute of limitations? [20]

---

[20] Minn. St. 541.01, in pertinent part, reads as follows: "Actions can only be commenced within the periods prescribed in this chapter, after

The contentions of the parties are as follows:

Defendants assert that Dr. Wild's defamation claims are barred by the 2-year statute of limitations; that a cause of action under the 2-year statute accrues when a lawsuit could first have been initiated; that Dr. Wild's causes of action had accrued by May 1964 and that Dr. Wild had sufficient knowledge to bring his lawsuit before December 3, 1966; that Dr. Wild's assertion that defendants fraudulently concealed the facts constituting the basis for his claims, which he argues tolled the statute of limitations, is without merit because there was no affirmative act or misrepresentation by them which prevented Dr. Wild from discovering the existence of his causes of action. In the alternative, defendants contend that the issues of fraudulent concealment of Dr. Wild's causes of action should have been a factual question for the jury under suitable instructions.

Dr. Wild argues that his causes of action for defamation and interference are not barred because the 2-year statute was tolled by defendants' fraudulent concealment of the existence of his causes of action and by defendants' continuing conspiracy to defame him; and that, even if fraudulent concealment was a fact issue for the jury, defendants waived their right to such an instruction because they did not request one at the trial.

Because we are dealing with an open question in this jurisdiction, we will simply list the various rules on the issue and suggest that the trial court apply that law to the facts on retrial.

The commentators and courts that have faced the issue have generally found that a cause of action accrues when the defamatory matter is published to a third party. They have found that when the matter is not defamatory per se, a cause of action accrues only when special damage is suffered. Gatley, Libel and Slander (4 ed.) c. 19, p. 382; 1 Seelman, The Law of Libel and Slander in the State of New York, § 189a, p. 231; 1 Hanson, Libel and Related Torts, § 154, p. 119; 50 Am. Jur. 2d, Libel and

the cause of action accrues." Minn. St. 541.15 on disabilities which will toll the statute is inapposite to the present fact situation.

Slander, § 390; 53 C. J. S., Libel and Slander, § 156; Restatement, Torts, § 899, *Comment c;* Miles v. McGrath, 4 F. Supp. 603, 604 (D. Md. 1933); Brown v. Chicago, R. I. & P. R. Co. 212 F. Supp. 832, 834 (W. D. Mo. 1963), affirmed, 323 F. 2d 420 (8 Cir. 1963); Hartmann v. Time, Inc. 64 F. Supp. 671, 678 (E. D. Pa. 1946), modified, 166 F. 2d 127, 135, 1 A. L. R. 2d 370 (3 Cir. 1947, 1948), certiorari denied, 334 U. S. 838, 68 S. Ct. 1495, 92 L. ed. 1763 (1948); Gregoire v. G. P. Putnam's Sons, 298 N. Y. 119, 81 N. E. 2d 45 (1945). See, also, Annotations, 1 A. L. R. 2d 884, 42 A. L. R. 3d 807.

Ignorance or lack of knowledge of a defamatory publication will not toll the statute of limitations. Irvin v. Bentley, 18 Ga. App. 662, 90 S. E. 359 (1916); Kern v. Hettinger, 303 F. 2d 333, 338 (2 Cir. 1962); Grist v. Upjohn Co. 1 Mich. App. 72, 134 N. W. 2d 358 (1965); Forman v. Missisippi Publishers Corp. 195 Miss. 90, 107, 14 So. 2d 344, 347, 148 A. L. R. 469, 473 (1943); Brown v. Chicago, R. I. & P. R. Co. 212 F. Supp. 832, 835 (W. D. Mo. 1963), affirmed, 323 F. 2d 420 (8 Cir. 1963); Hartmann v. Time, Inc. 64 F. Supp. 671, 678 (E. D. Pa. 1946), modified, 166 F. 2d 127, 1 A. L. R. 2d 370 (3 Cir. 1947, 1948), certiorari denied, 334 U S. 838, 68 S. Ct. 1495, 92 L. ed. 1763 (1948); 1 Hanson, Libel and Related Torts, § 154; 1 Seelman, The Law of Libel and Slander in the State of New York, § 189a, p. 231; Restatement, Torts, § 899, *Comment e.* See, also, 54 C. J. S., Limitations of Actions, § 205; 51 Am. Jur. 2d, Limitation of Actions, § 146; 11A Dunnell, Dig. (3 ed.) § 5609, for the general rule that ignorance or lack of knowledge of the existence of a cause of action will not toll the statute of limitations for most claims.[21]

---

[21] While existing law in most jurisdictions generally holds that the statute of limitations on defamation starts to run on publication, and, further, that lack of knowledge on the part of the one defamed will not toll the statute, as indicated in the text, it has been suggested that an exception should be carved out of the general rule in the case of a so-called "private libel" such as an interoffice memorandum, intercompany correspondence, private letters, or correspondence between

450

Fraudulent concealment of a defamatory publication will toll the 2-year statute of limitations until discovery or reasonable opportunity for discovery of the publication by the exercise of ordinary diligence. Cf. McCarlie v. Atkinson, 77 Miss. 594, 27 So. 641 (1900); Staples v. Zoph, 9 Cal. App. 2d 369, 49 P. 2d 1131 (1935); Restatement, Torts, § 899, *Comment e.* See, also, 54 C. J. S., Limitations of Actions, § 206; 51 Am. Jur. 2d, Limitation of Actions, § 147; 11A Dunnell, Dig. (3 ed.) § 5608; Schmucking v. Mayo, 183 Minn. 37, 235 N. W. 633 (1931); Couillard v. Charles T. Miller Hospital, Inc. 253 Minn. 418, 92 N. W. 2d 96 (1958), for the general rule that for most causes of action fraudulent concealment of the existence of a cause of action will toll the statute of limitations, postponing the commencement of the running of the statute until discovery or reasonable opportunity for discovery of the fact by the exercise of ordinary diligence. The party claiming fraudulent concealment has the burden of showing that the concealment could not have been discovered sooner by reasonable diligence on his part and was not

business or research entities and a governmental unit relative to mutual concerns. In these latter cases, where the defamed person is unaware of the defamation because of the limited extent of publication—as contrasted to a "public defamation" in the press, on the air, or from a public platform—he may, nevertheless, be seriously damaged, and a strong argument can be made that the statute should not commence to run until the defamed person knows of the publication of the defamatory material, or in the exercise of reasonable care, should know of the existence of the same. This test, of course, is somewhat analogous to the "discovery rule" in medical malpractice cases which so far Minnesota has declined to adopt. Schmucking v. Mayo, 183 Minn. 37, 235 N. W. 633 (1931); Johnson v. Winthrop Laboratories Division of Sterling Drug, Inc. 291 Minn. 145, 190 N. W. 2d 77 (1971). Nevertheless, in order that the question in the case of a "private libel" might be preserved for future consideration, the trial court assigned to try the case on remand may wish to submit an interrogatory which asks the jury to determine when Dr. Wild knew, or in the exercise of reasonable care, should have known of the particular alleged defamatory matter in question.

the result of his own negligence. Duxbury v. Boice, 70 Minn. 113, 120, 72 N. W. 838, 839 (1897).

There is no categorical definition of what constitutes fraudulent concealment. 54 C. J. S., Limitations of Actions, § 206(f). One text states that—

"* * * the concealment must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action. * * *

"Although mere silence or failure to disclose may not in itself constitute fraudulent concealment, any statement, word, or act which tends to the suppression of the truth renders the concealment fraudulent." 51 Am. Jur. 2d, Limitation of Actions, § 148.

In this vein, it should be mentioned:

"* * * It is not necessary that a party should know the details of the evidence by which to establish his cause of action; it is enough that he knows that a cause of action exists in his favor, and when he has this knowledge it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim." 54 C. J. S., Limitations of Actions, § 206(e).

### DEPOSITIONS

Sometime in 1963 or 1966, John R. Graham, one of Dr. Wild's attorneys, allegedly learned from Dr. Costas Assimacopoulos, a Ph. D. candidate doing research at Mount Sinai Hospital, that Dr. Francisco Grande, director of the Research Laboratory at Mount Sinai, had attended a meeting at Mount Sinai regarding the project in advance of Dr. Wild's meeting with the research committee on December 9, 1963. At the earlier meeting, Rarig allegedly made disparaging remarks about Dr. Wild and the project. Dr. Assimacopoulos allegedly inferred to Graham that Rarig's remarks were the basis for Mount Sinai's decision not to accept sponsorship. Graham sought confirmation of this from Dr. Grande in 1966, but Dr. Grande could not recall the conver-

sation with Dr. Assimacopoulos. Dr. Wild subsequently took the depositions of Dr. Grande (on May 5, 1970) and Dr. Assimacopoulos (on June 22, 1970), in which depositions their previous assertions were repeated.

At the trial, Dr. Wild attempted to subpoena Dr. Grande, who lived in Minnesota but who was temporarily out of the state. After having read Dr. Grande's deposition into evidence, Dr. Wild's counsel was permitted to use the deposition of Dr. Assimacopoulos, who was an out-of-state resident. The trial court did not instruct the jury as to whether Dr. Assimacopoulos' deposition was to be used as substantive evidence or was to be used for impeachment only, and defendants did not request a cautionary instruction.

Defendants assert that Dr. Assimacopoulos' deposition testimony was hearsay; that the trial court gave no cautionary instruction to indicate that Dr. Assimacopoulos' deposition was to be used for impeachment purposes only; and that Dr. Assimacopoulos' deposition could not be used for impeachment purposes anyway since no surprise was shown and Dr. Wild would be impeaching his own witness (Dr. Grande).

Dr. Wild argues that Dr. Assimacopoulos' deposition testimony was not hearsay but a verbal act used, not to prove the truth of the matter asserted, but to prove he "was making efforts to get a new sponsor, and that it was unsuccessful because of an appearance by Rarig before the Mount Sinai Board"; that if considered hearsay, it is admissible under one or more of 15 exceptions to the hearsay rule; that if considered impeachment, he could properly impeach his own witness because he was "surprised"; and that in any event the evidence was merely cumulative.

We think that Dr. Assimacopoulos' deposition, if used as substantive evidence, was clearly hearsay and not within an exception to the hearsay rule. The content of a deposition is treated under the exclusionary rules of evidence as though the witness were then present in court and testifying. Rules of Civil Pro-

cedure, Rule 26.05. If Dr. Assimacopoulos were present in the courtroom, his testimony would be stricken as hearsay and that rule must apply to his deposition also.

Since Dr. Assimacopoulos' deposition was not admissible as substantive evidence, the relevant issue is whether it could be used for impeachment purposes. We think the applicable law is well settled. The following statement may be found in 20 Dunnell, Dig. (3 ed.) § 10356:

"* * * It is the general rule that a party cannot impeach a witness whom he has called by proof of contradictory statements out of court. * * * If a party is surprised by the adverse testimony of his own witness he may be permitted by the court, in the exercise of its discretion, to impeach the witness by proof of contradictory statements, a proper foundation being laid. This applies to criminal as well as civil cases."

Whether or not there is genuine surprise "presents a preliminary question for determination by the trial court, and ordinarily we will not reverse unless there is an abuse of discretion." State v. Guy, 259 Minn. 67, 73, 105 N. W. 2d 892, 897 (1960). The principles applicable to the right to impeach a party's own witness are adequately stated in former decisions of this court and other courts. Selover v. Bryant, 54 Minn. 434, 56 N. W. 58 (1893); State v. Saporen, 205 Minn. 358, 285 N. W. 898 (1939); Fjellman v. Weller, 213 Minn. 457, 7 N. W. 2d 521 (1942); State v. Dahlgren, 259 Minn. 307, 107 N. W. 2d 299 (1961); State v. Schwartz, 266 Minn. 104, 122 N. W. 2d 769 (1963); State v. Johnson, 289 Minn. 346, 184 N. W. 2d 660 (1971). See, also, Young v. United States, 97 F. 2d 200 (5 Cir. 1938).

If Dr. Grande had personally testified, Dr. Wild could not have impeached him since there would have been no genuine surprise on his part.[22] The pivotal issue is whether the general rule

---

[22] The rules of evidence relating to impeachment of a party's own witness have been substantially modified under Rule 43.02 of the Rules of

against impeachment of a party's own witness except when his testimony results in genuine surprise will be followed when depositions are used.

Rule 26.06, Rules of Civil Procedure, reads as follows:

"A party shall not be deemed to make a person his own witness for any purpose by taking his deposition. The introduction in evidence of the deposition or any part thereof for any purpose other than that of contradicting or impeaching the deponent makes the deponent the witness of the party introducing the deposition, but this shall not apply to the use by an adverse party of a deposition as described in Rule 26.04(2). At the trial or hearing, any party may rebut any relevant evidence contained in a deposition whether introduced by him or by any other party."

See, also, McCormick, Evidence (2 ed.) § 38, footnote 80. Under Rule 26.06, when Dr. Wild introduced Dr. Grande's deposition into evidence, he made Dr. Grande his own witness. Consequently, we hold that the general rule against impeaching a party's own witness applies, and Dr. Wild could not attack Dr. Grande's credulity since he was not genuinely surprised. Dr. Wild is in-

---

Civil Procedure, but that rule does not apply to Dr. Grande. Rule 43.02 reads as follows:

"A party may interrogate an unwilling or hostile witness by leading questions. A party may call an adverse party or his managing agent or employe or an officer, director, managing agent or employe of the state or any political subdivision thereof or of a public or private corporation or of a partnership or association or body politic which is an adverse party, and interrogate him by leading questions and contradict and impeach him on material matters in all respects as if he had been called by the adverse party. Where the witness is an adverse party he may be examined by his counsel upon the subject matter of his examination in chief under the rules applicable to direct examination, and he may be cross-examined, contradicted and impeached by any other party adversely affected by his testimony. Where the witness is an officer, director, managing agent or employe of the adverse party he may be cross-examined, contradicted and impeached by any party to the action."

directly doing what he cannot do directly. He is offering a witness whose testimony he knows in advance will be adverse in order to put before the jury, in the form of impeachment, contradicting statements which are useful to his case. This is a contrived impeachment situation in which the only value of the witness's prior statement will be as substantive evidence of the facts asserted, McCormick, Evidence (2 ed.) § 38, p. 76, and admission of the Assimacopoulos deposition was error.

### DEFENDANT'S EXHIBIT 101

Paul I. Wolf, vice president of engineering for the Digital Scientific Corporation, a California entity, testified that he worked for Dr. Wild at St. Barnabas Hospital from 1953 to September 1960. His general dissatisfaction with the situation at St. Barnabas Hospital culminated in an April 13, 1960, letter (defendants' exhibit 101), jointly written and signed by himself, by Dr. Harry Crawford, co-principal investigator on Dr. Wild's project at St. Barnabas, and by Elwood Jacobson, a member of Dr. Wild's staff who is now dead. Wolf testified he hand-delivered the letter to Dr. Finn Larsen, a member of the St. Barnabas board and an advisor to the St. Barnabas Foundation, who is now deceased, and that the letter reflected the witness' views and those of his two colleagues on the status of the Dr. Wild project. The trial court sustained Dr. Wild's hearsay objection.

The letter, if received into evidence, would have revealed criticisms of Dr. Wild's handling of his staff, his capricious and arbitrary manner of making scientific decisions, and of his lack of competence in electronics, and a suggestion that a new director should be appointed to take over the project. Defendants claim the letter was admissible as a business record under Minn. St. 600.02, while Dr. Wild argues that the exclusion of the letter "was a fair and reasonable exercise of discretion by the trial judge"; that the exhibit was cumulative; and that its exclusion from evidence was not prejudicial.

The Minnesota Uniform Business Records as Evidence Act, in Minn. St. 600.01, reads as follows:

"The term 'business' shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not."

Minn. St. 600.02 reads as follows:

"A record of an act, condition, or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission."

The above statute requires that entries be made in the "regular course of business." This means that it was in the regular course of the business to make such entries; that it was the routine of the particular business to make such entries, McCormick, Evidence (2 ed.) § 308; 5 Wigmore, Evidence (3 ed.) § 1523; and that the entry was not a casual and isolated one, 5 Wigmore, Evidence (3 ed.) § 1525. The element of circumstantial guarantee of trustworthiness and the element of necessity, needed to obviate the hearsay rule, are found in the systematically and habitually made entries which are then relied on by the particular business. In other words, the records have a likelihood of being truthful because they are relied on by the particular business in the conduct of its affairs.

This letter (defendants' exhibit 101) was not a business record. It was a personal evaluation of Dr. Wild made by three members of his staff. This evaluation was not part of the regular course of business of the scientific project. The authors of the letter were employed to do scientific research and not to write a letter evaluating their scientific leader. This letter is not the type of record entry regularly and systematically kept and, there-

fore, likely to be reasonably trustworthy. The trial court properly excluded it from evidence.

## LYMAN COLE'S TESTIMONY

A few weeks after the trial had begun, Dr. Wild's counsel, in chambers, requested the trial court's permission to use Lyman Cole's testimony to introduce evidence he would otherwise elicit from Justice James C. Otis, a member of the Minnesota Supreme Court and a director of Amherst Wilder Foundation and Minnesota Foundation. An offer of proof was made and a hearsay objection was sustained. The trial court intimated that Justice Otis should be called as a witness and then impeached by Cole's testimony.

Later in the trial, Justice Otis was called as a witness and testified that he had "no recollection" of a telephone call from the late John Dorsey, a Minneapolis attorney, in November or December of 1963 as to why Minnesota Foundation terminated sponsorship of Dr. Wild's research project.

Dr. Wild subsequently put on the stand Lyman Cole, a Minneapolis investment banker, who testified that he, Dr. Wild, and Sidney Colbert, chairman of the advisory committee, met with the late John Dorsey in the latter's office at which time Dorsey allegedly telephoned Justice Otis regarding the reasons for Minnesota Foundation's termination of sponsorship. Although he could not hear the voice on the other end of the telephone conversation, Mr. Cole testified that Mr. Dorsey had related Justice Otis' conversation regarding the reasons for termination of Dr. Wild's project.

Defendants objected that Cole's testimony was hearsay, conversations with a dead person, and was given without proper foundation or identification of the person to whom John Dorsey was talking. The trial court overruled defendants' objections and did not instruct the jury as to whether Cole's testimony was to be used as substantive evidence or only for the purpose of impeachment of Justice Otis' credibility. No cautionary instruction was requested by the defendants.

Defendants assert that the trial court committed error in these rulings and in not instructing the jury that Lyman Cole's testimony was to be used for impeachment purposes only. They argue that when the trial court failed to do this, Cole's testimony was permitted to be interpreted by the jury as substantive evidence. Dr. Wild claims that Cole's testimony was admissible as substantive evidence under the res gestae exception to the hearsay rule or else was admissible for impeachment purposes.

Since it is unclear which purpose the trial court admitted Lyman Cole's testimony for, we will consider it as either substantive evidence or as impeachment. If the trial court admitted Cole's testimony as substantive evidence, it was error since it is clearly double hearsay and does not come within an exception to the hearsay rule. McCormick, Evidence (2 ed.) § 246.

Because Cole's testimony was not admissible as substantive evidence, the relevant issue is whether it could be used for impeachment purposes. We think that it could not. There is no doubt that prior inconsistent statements which are hearsay may be used for impeachment purposes. McCormick, Evidence (2 ed.) §§ 34, footnote 7, and 39. It is also true that a witness may be impeached if he denies or fails to recollect making the prior inconsistent statement. Price v. Grieger, 244 Minn. 466, 472, 70 N. W. 2d 421, 425 (1955) ; McCormick, Evidence (2 ed.) § 37 and footnote 47. However, before a witness may be impeached by a prior inconsistent statement, it should be shown by adequate foundation that he made a prior inconsistent statement. That was not done in this case as Cole could not hear the voice on the other end of the telephone conversation. That voice, if there was one, could have been the voice of anyone.

All other issues raised in this appeal have been considered and are deemed without merit.

Reversed and remanded for a new trial with directions.

IRVINE, JUSTICE (concurring specially).

I agree that there must be a new trial if all issues are to be con-

sidered. However, if the case were properly tried, it seems likely that the plaintiff would be able to establish a cause of action for defamation or interference with future contracts (but not both), and that he could prove damages. Therefore, in order possibly to avoid the agony and the expense of a new trial, I would give the plaintiff the option of agreeing to a remittitur to One Million Five Hundred Thousand Dollars ($1,500,000).

ODDEN, JUSTICE (concurring specially).

I agree with the concurring opinion of Judge Irvine.

JOHNSON, JUSTICE (concurring specially).

I agree with the concurring opinion of Judge Irvine.

On October 16, 1975, the following order was filed:

Upon all the files and records herein, and being fully advised in the premises, and for the reasons stated in the memorandum which is attached to and hereby made part of this order,

IT IS HEREBY ORDERED that the relief requested by respondent John J. Wild, M.D., in his motion dated August 15, 1975, be and hereby is denied.

IT IS ALSO HEREBY ORDERED that the order of the Clerk of the Supreme Court entered August 25, 1975, disallowing to defendants-appellants the taxation of costs and disbursements in this matter, be and hereby is affirmed.

IT IS ALSO ORDERED AND DIRECTED that the stay of proceedings heretofore granted in this matter is now hereby vacated, and this matter is remanded to the District Court of Hennepin County for further proceedings consistent with the opinion of the Minnesota Supreme Court filed on the 17th day of January, 1975.

Dated this 16th day of October, 1975.

By the Court:

ROBERT J. SHERAN

Chief Justice

## MEMORANDUM

The relief requested by respondent's motion dated August 15, 1975, implicitly involves the following contentions:

(1) That the district court judges appointed to serve as the Supreme Court of the State of Minnesota for the purpose of considering and deciding the appeal here involved were without authority to act;

(2) That some of the judges so appointed were not qualified to decide this case by reason of their interest in its outcome;

(3) That the opinion filed herein on the 17th day of January, 1975, by said judges exercising the authority of the Supreme Court of the State of Minnesota for the purpose of deciding this appeal and the subsequent order by said judges denying respondent's petition for reargument require confirmation by the permanent members of the Supreme Court and are subject to revision or review by the permanent members of the Minnesota Supreme Court who did not participate in the decision;

(4) That this court should allow the attorneys for respondent $500,000 as attorneys fees and $20,000 as costs in the interests of justice and equity.

1. Minn. Const., art. 6, § 2, provides:

"The supreme court shall consist of one chief judge and not less than six nor more than eight associate judges as the legislature may establish. It shall have original jurisdiction in such remedial cases as may be prescribed by law and appellate jurisdiction in all cases, but there shall be no trial by jury in said court.

"Judges of the district court may be assigned as provided by law temporarily to act as judges of the supreme court upon its request."

Minn. St. 2.724, subd. 2, provides in part:

"Any number of justices may disqualify themselves from hearing and considering a case, in which event the supreme court may assign temporarily a retired justice of the supreme court or a district judge to hear and consider the case in place of each disqualified justice. * * *."

In this case, affidavits and representations and actions filed

on behalf of respondent were of such a nature that each of the permanent members of the Minnesota Supreme Court decided not to participate in the decision of this appeal.[1] It was therefore determined that the procedure prescribed by Minn. St. 2.724, subd. 2, should be employed. The permanent members of the Supreme Court of the State of Minnesota then resolved, unanimously, that the following principles for the selection of replacement judges should be applied:

(A)   That the chief judge of each of the ten judicial districts of the State of Minnesota except the second (Ramsey County) would be invited to hear and consider the appeal in this case.[2]

(B)   That in any case where the chief judge of a judicial district declined to serve, the judge of that district senior in service as a district judge would be invited to serve in the chief district judge's stead.[3]

Pursuant to these principles of selection, the Chief Justice, acting for the permanent court, invited the following chief district court judges to serve on this appeal:

The Honorable Robert J. Breunig, Chief Judge of the
    First Judicial District;
The Honorable Glenn E. Kelley, Chief Judge of the
    Third Judicial District;
The Honorable Douglas K. Amdahl, Chief Judge of the
    Fourth Judicial District;

---

[1] One of the permanent members of the Minnesota Supreme Court is and for some time has been a Director of the Foundations. None of the other members of the Supreme Court has served the Foundations in any capacity.

[2] The second judicial district (Ramsey County) was excluded because appellant's charitable activities have been centered there.

[3] A statement setting forth the above principles and procedures followed in the selection of replacement judges in this case was made by the permanent Supreme Court on May 8, 1975. The statement was filed with the Clerk of the Supreme Court and copies sent to the parties involved.

The Honorable Milton D. Mason, Chief Judge of the
Fifth Judicial District;

The Honorable Donald C. Odden, Chief Judge of the
Sixth Judicial District;

The Honorable Chester G. Rosengren, Chief Judge of the
Seventh Judicial District;

The Honorable C. A. Rolloff, Chief Judge of the
Eighth Judicial District;

The Honorable James E. Preece, Chief Judge of the
Ninth Judicial District;

The Honorable Robert D. Gillespie, Chief Judge of the
Tenth Judicial District.

In three judicial districts, the chief judge of the district was unable to accept the invitation to serve. As a result, the following district judges senior in service in their respective districts were invited to serve:

The Honorable Rolf Fosseen, Senior District Judge of the
Fourth Judicial District;

The Honorable L. J. Irvine, Senior District Judge except for
the Chief Judge of the Fifth Judicial District;

The Honorable William T. Johnson, Senior District Judge
except for the Chief Judge of the Tenth Judicial District.

As a result of this process, the judges who constituted the panel for this case were:

The Honorable Robert J. Breunig, Chief Judge of the
First Judicial District;

The Honorable Glenn E. Kelley, Chief Judge of the
Third Judicial District;

The Honorable Rolf Fosseen, Senior District Judge of the
Fourth Judicial District;

The Honorable L. J. Irvine, Senior District Judge except for
the Chief Judge of the Fifth Judicial District;

The Honorable Donald C. Odden, Chief Judge of the
Sixth Judicial District;

The Honorable Chester G. Rosengren, Chief Judge of the
Seventh Judicial District;

The Honorable C. A. Rolloff, Chief Judge of the
Eighth Judicial District;

The Honorable James E. Preece, Chief Judge of the
Ninth Judicial District;

The Honorable William T. Johnson, Senior District Judge
except for the Chief Judge of the Tenth Judicial District.

This method of selection complied with the authority granted
by the constitutional and statutory provisions set out above. The
suggestion that each of the permanent members of the Minnesota
Supreme Court selected his own replacement is contrary to fact
and without merit.

2. The judges who were appointed to hear and decide this
case and did so were not disqualified from serving by reason of
interest in its outcome. The burden of establishing disabling dis-
qualification rests with the party who asserts it.[4] We find noth-
ing in the affidavits filed by and on behalf of respondent which
supports the assertions of respondent in this regard.

3. The district judges assigned the responsibility of hearing
and deciding this case acted as the Minnesota Supreme Court
in so far as this appeal is concerned.[5] The opinion filed on Janu-
ary 17, 1975, was the official pronouncement of the Minnesota

---

[4] Kinnear-Weed Corp. v. Humble Oil Refining Co. 441 F. 2d 631 (5 Cir.
1971), certiorari denied, 404 U. S. 941, 92 S. Ct. 285, 30 L. ed. 2d 255, re-
hearing denied, 404 U. S. 996, 92 S. Ct. 532, 30 L. ed. 2d 549. Cf. Basker-
ville v. Baskerville, 246 Minn. 496, 75 N. W. 2d 762 (1956).

[5] Since, under Minn. St. 2.724, subd. 2, "any number of justices may
disqualify themselves from hearing and considering" a particular case,
it follows that when all the justices disqualify themselves the substitute
court becomes the Minnesota Supreme Court for the case in question.
See, United States v. Isaacs, 493 F. 2d 1124 (7 Cir. 1973). As was held in
Fay v. District Court of Appeal, Second Appellate Dist., Division 2, 200
Cal. 522, 254 P. 2d 896 (1927), a substitute justice, assigned to assist an
appellate tribunal, has the same powers as possessed by the regularly
constituted members of the tribunal.

Supreme Court with respect to this case. The original opinion, filed with the Clerk of the Supreme Court, is initialed by each of the judges who participated in the decision. By initialing the opinion, each judge expressed his agreement with and adoption of its contents. This done, the opinion, written "per curiam," became the official opinion of the Minnesota Supreme Court, and made final the disposition of this case, subject only to the provisions of law pertaining to petitions for rehearing.[6] The petition for rehearing, constituting in effect a challenge to the opinion as originally filed, was properly referred to the district judges who heard and decided the case.[7] When the petition for rehearing was denied by order dated July 31, 1975, the temporary panel of judges had completed their responsibilities.[8] The opinion filed January 17, 1975, is the opinion of the Minnesota Supreme Court in this case and it constitutes a final disposition of this matter on appeal. Upon remand, the district court will have jurisdiction to proceed with the new trial mandated by the opinion. Because the temporary panel's opinion is based upon the assignment of authority contained in art. 6, § 2, of the Constitution and Minn. St. 2.724, subd. 2, it is entitled to the same weight and credit as any other opinion of this Court.[9] We acknowledge and follow this principle by our action today.

4. Respondent's request that attorneys' fees in the amount of $500,000 and costs in the amount of $20,000 be allowed is denied.

5. The order of August 25, 1975, disallowing taxation of costs

---

[6] Rule 140, Rules of Civil Appellate Procedure.

[7] United States v. Isaacs, 493 F. 2d 1124, 1168-69 (7 Cir. 1973).

[8] A substitute judge has power and authority to act until the completion of any business begun before him, but his commission expires with the final disposition of the case. State v. Meisinger, 258 Minn. 297, 103 N. W. 2d 864 (1960); Anderson v. Bledsoe, 139 Cal. App. 650, 34 P. 2d 760 (1934). Upon selection of a special or substitute judge, the powers of the regular judge are suspended so far as they relate to the case which the former has been chosen to try or hold. Kane v. Ferguson, 195 Okl. 292, 157 P. 2d 194 (1945).

[9] State v. Wear, 145 Mo. 162, 46 S. W. 1099 (1898).

and disbursements to the appellants, is affirmed on authority of Village of Blaine v. Independent School District No. 12, 265 Minn. 9, 121 N. W. 2d 183 (1963).

Let this Memorandum be attached to and made part of the foregoing Order.

R.J.S.

MR. JUSTICE OTIS took no part in the consideration or decision of this motion and did not participate in establishing the principle of selection adopted by the Minnesota Supreme Court explained in the memorandum.